Strafford,  }
April 3, 1934. }

### F. C. ADAMS, INC. *v.* FRANK H. THAYER & *a.*, *Ex'rs.*

*Wyman, Starr, Booth & Wadleigh* (*Mr. Ralph E. Langdell* orally), for the plaintiff.

*Hughes & Burns* (*Mr. Hughes* orally), for the defendants.

MARBLE, J.   Much of the plaintiff's brief is devoted to a discussion of the law of Massachusetts relating to the reciprocal rights of a stock-

broker and his customer, and many of the authorities relied upon were cited in the motion for rehearing. 416 Briefs & Cases, 203. That motion was granted, and after argument the court affirmed its former conclusion that "transactions with the special features which the case presents" are "purchases from the broker under Massachusetts law." 85 N. H. 177, 185. Any contention that the court erred in reaching this conclusion, on the evidence then before it, is not germane to the present inquiry, since questions of law once decided will not be reconsidered in the same case except on motion for rehearing. *Watkins* v. *Railroad*, 84 N. H. 124, 126; Hening's Digest, *p.* 1286.

According to the affidavits, the customary compensation of a broker for purchasing unlisted stock varies from one and one-half to three and one-half points. This variation is due to the fact that there is no central market for such stock, and the labor involved in procuring it may be greater than that required to obtain listed securities for which a definite commission is charged.

It is the common practice for a customer to name a net price which he will pay for an unlisted stock and for the broker to execute the order by purchasing the stock at a price which will allow him reasonable compensation for his services. If the broker obtains the stock at a figure which affords unreasonable compensation, he gives the customer "the advantage of a lower price than his bid price," and if "the order can not be filled except at precisely the customer's bid," the customer is notified that the stock will not be purchased unless he is "willing to pay a commission in addition to his bid price."

"By reason of common practice as exercised in usual stock transactions, it is not considered that the statute of frauds under the law of Massachusetts applies." Consequently no signed memorandum "is used on either side" until the transaction is completed.

It is suggested that the custom of charging the purchaser a lower price than his bid price "whenever the spread of quoted prices" would result in unreasonable compensation "is diametrically opposed to a conception of vendor-vendee relationship."

This contention is questionable. Presumably the brokerage business is not immune from the same economic laws which tend to stabilize profits in the business world, and the mere fact that a merchant finds it to his advantage to treat a patron fairly is quite insufficient to prove that he is acting as the patron's agent. Similarly, evidence that brokers of unlisted securities place a limit on the compensation they deem it advisable to charge a customer does not alone warrant an inference that the customer's offer to buy is "an employment of

the plaintiff to buy for him." 85 N. H. 177, 182. This practice is of slight significance, however, in view of the special arrangement into which the decedent and the plaintiff entered.

The details of this arrangement appear in the affidavit of Frederick C. Adams, president of the plaintiff corporation. Far from indicating a mutual understanding "that the differential should be a commission, or service charge," as the plaintiff claims, the evidence shows a definite intention to treat the so-called differential as profit due an independent contractor, 85 N. H. 177, 183.

The material portions of the Adams affidavit are as follows: "I, Frederick C. Adams, hereby certify that prior to the transaction with Mr. Thayer in 1925, I had had other transactions with and for him beginning when I was in the employ of Albee & Co. When he first came to the office of that concern, he came to inquire about an advertisement and stated that the Albee Company handled certain securities in which he was interested. At that time, and subsequently when he first gave me orders to purchase New England Guaranty stock for him, he told me that his bid was to be considered as a net bid, and that unless we could fill the order at a price enough less than his bid to pay ourselves for the trouble of handling the order, we need not fill it. He stated to me that he was accustomed to deal in stocks and was well acquainted with market conditions, and that his bid was made, and that all bids he would make would be made on a basis of his knowledge of the market. He further stated that these bids would be made close enough to what he thought we would be able to buy the securities for, consequently in any case we would not be able to secure for ourselves any unreasonably large compensation. My experience with the execution of his orders demonstrated that this was so. In one case in attempting to secure some of this New England Guaranty stock I found we could not buy it below his bid price, and I asked him if he would pay a commission in addition to the amount bid, and he answered—'No, if you cannot buy it for less so as to pay yourselves by the difference in price, you will not fill the order.' . . .

"Mr. Thayer's bids upon which Frederick C. Adams, Inc. acted in this case were very close to what the general market conditions warranted, and the difference between his bid and the price at which we were able to purchase the stock represented no more than a reasonable compensation for a broker in such a case."

These facts flatly negative any inference which might otherwise be drawn that the decedent and the plaintiff entered into the fiduciary

relation of principal and agent. There is no evidence that the decedent was aware of the practice of brokers in cases of net bids to "remit excessive charges." Nor does it definitely appear that the plaintiff followed this practice. The evidence, if produced, would be immaterial, however. For, whatever the fact, the terms of the special arrangement including the decedent's assertion that his knowledge of the market would prevent the plaintiff from obtaining unreasonable compensation could only mean that the decedent was looking after his own interests as a buyer of the stock and that the plaintiff, as seller, was entitled to the entire differential, small or large, as the case might be.

The fact that the differential happened in no specific instance to exceed a sum equivalent to a reasonable commission has little significance except to show the correctness of the decedent's assertion, and refusal in a particular case to pay more than the named price merely indicates insistence by the decedent on the conditions of his bid.

In short, the new evidence does not affect the result previously reached; namely, that the transactions in question, because of their special features, were contracts of purchase and sale.

That being true, the statute of frauds could not be avoided by the custom of brokers "to recognize and act on oral orders" in the belief that the statute did not apply. Apparently this practice and belief extended only to usual stock transactions. But even if orders with the special features of the decedent's orders were commonly regarded as exempt from the statute, the result would not be otherwise.

It is generally held that usage cannot be so construed as "to repeal or violate the positive rules of statute law." *Scribner* v. *Hollis*, 48 N. H. 30, 35. To the same effect, see *State Nat. Bank of Lynn* v. *Company*, 267 Mass. 355, 361.

*Exception overruled.*

All concurred.