MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. *v.*
MORTON E. COLE
MORTON E. COLE *v.* MERRILL LYNCH, PIERCE, FENNER
& SMITH, INC., ET AL.
(10473)
(10474)

PETERS, HEALEY, PARSKEY, SHEA and GRILLO, Js.

Argued  January  13—decision  released  March  15,  1983

*Morton E. Cole,* with whom, on the brief, was *Cyril Cole,* for the appellant(defendant in the first case, plaintiff in the second case).

*Philip S. Walker,* with whom, on the brief, was *Felix J. Springer,* for the appellee (plaintiff in the first case, defendant in the second case).

PARSKEY, J. These cases arise out of a transaction involving the sale of shares of stock of the Connecticut General Life Insurance Company (CG) owned by Morton E. Cole (Cole). In one case (Merrill Lynch case) the stock brokerage firm of Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) brought an action against Cole for breach of contract by Cole to sell Merrill Lynch 5000 shares of CG stock. In the other case (Cole case) Cole sued Merrill Lynch in six counts for breach of contract, fraud, and fraudulent breach of trust. The cases, which were tried simultaneously, the Merrill Lynch case being tried to the court and the Cole case to the jury, resulted in a judgment for damages in favor of Merrill Lynch in the court trial and a verdict and judgment for Merrill Lynch in the jury trial. Cole has appealed in both cases.

The trier could have found the following facts. Cole is the owner of 19,950 shares of CG common stock, which stock is generally traded in the over-the-counter market. Merrill Lynch is a broker-dealer member of the New York and other major stock exchanges. For many years Cole has been a customer of Merrill Lynch through its branch office in Hartford. Cole is also an attorney who has maintained an office in Hartford for many years.

On February 19, 1974, Cole informed Byrne Kinney, a registered representative of Merrill Lynch at its Hartford office and Cole's account executive, that he wished to sell all of his shares of CG common stock. At that time CG shares were selling at $52 a share in the open market. The $52 price was for 100 share lots but not for large blocks such as Cole owned. Kinney informed Herbert H. Hedick, manager of the Hartford office, of Cole's offer and thereafter arranged a meeting among Cole, Kinney and Hedick on February 20. At that meeting Kinney and Hedick informed Cole that an attempt to dispose of the entire block on the open market would depress the market price to Cole's detriment. They recommended that Cole give Merrill Lynch an opportunity to bid for the whole block as a principal for its own corporate account. At that time Merrill Lynch in its capacity as broker-dealer "made a market"[1] for CG stock and retained an inventory in the stock for such purpose.

---

[1] Making a market has been defined as: "A term particularly applicable to the over-the-counter market, indicating those firms, maintaining markets in particular issues, i.e., standing ready to quote firm quotations (bid and asked) to buy and sell. This usually involves maintaining a 'position' (inventory) on the issue concerned." Munn, Encyclopedia of Banking and Finance (7th Ed.).

Also, in Davids, Dictionary of Banking and Finance, the term is

Over the telephone and in the presence of Cole and Kinney, Hedick sought a bid from Charles Truchan, Merrill Lynch's block trader in New York, who extended an offer of $51 a share for the entire block at the same price which Cole rejected. Truchan then extended an offer to pay $51 for 5000 shares if Cole would give Merrill Lynch a thirty minute option to purchase the remainder of the block. Cole rejected this offer but agreed to sell 5000 shares outright to Merrill Lynch at $51.50 with an option in Merrill Lynch to purchase, by the end of the trading day, the remaining 14,950 shares at $51.75. Truchan accepted Cole's proposal and attempted unsuccessfully during the balance of the trading day to place the remaining shares. Cole remained in Hedick's office until the close of trading when Truchan called to state that he was unable to exercise the option for purchase of the remaining CG shares. The proceeds from the sale of the 5000 CG shares were credited to Cole's account.

Shortly after Cole left Hedick's office, Truchan called Hedick again with an offer to purchase the remaining shares at the expired option price of $51.75. This offer was immediately conveyed by telephone to Cole by Kinney, but Cole indicated that he was not interested in doing any more business that day.

The next morning, February 21, 1974, Cole called Hedick and asked to nullify the prior day's trade because he felt the price for the 5000 shares was inadequate. A meeting among Cole, Kinney and

defined as follows: "3. Action of a dealer in the over-the-counter market in acquiring an inventory in a new issue security whereby he stands ready to buy and sell for his own account. His profit is then made from the 'spread,' or difference in what he pays for the security and what he can sell it for."

Hedick was arranged for that afternoon, at which Cole repeated his request that the sale of the 5000 CG shares be nullified but Hedick refused to consider rescission of the transaction and informed Cole that he had an obligation to deliver the 5000 shares to Merrill Lynch by the settlement date of February 27, 1974.

Consistent with its usual practice after executing any stock transaction, Merrill Lynch mailed a confirmation notice to Cole on February 21, 1974, memorializing his sale of 5000 shares of CG on February 20, 1974, at $51.50 a share. On February 22, 1974, also pursuant to its usual practice, Merrill Lynch mailed a "securities due" notice to Cole informing him that by the settlement date of February 27, 1974, the 5000 CG shares sold to Merrill Lynch on February 20, 1974, would have to be delivered. Both of these communications were sent to Cole's Hartford office address at One Constitution Plaza. Because of Cole's avowed intent not to deliver the 5000 shares, Hedick sent him a telegram at his Hartford office late in the day on February 22, 1974, informing him of his obligation to deliver the shares. The telegram further advised that in the case of Cole's failure to deliver the securities as requested, Merrill Lynch would purchase and charge to his account a number of shares equal to those he was obligated to deliver under the February 20 agreement.

As a result of Cole's failure to deliver the 5000 CG shares by the February 27 due date, Merrill Lynch "bought-in" 5000 shares of CG stock in the market to eliminate the deficit in its corporate trading account inventory. The cost of these "buy-in" purchases exceeded by $8572.23 the amount Merrill Lynch had contracted to pay Cole for his shares.

Cole left for Florida on February 22 and returned on March 6, 1974. Upon his return Cole hand delivered a letter to Hedick in which he noted his objection to the transaction involving the sale of 5000 CG shares to Merrill Lynch.

The trial court found the issues for Merrill Lynch in its suit against Cole and rendered a judgment for Merrill Lynch in the amount of $8572.23 plus interest from February 27, 1974. In the suit by Cole against Merrill Lynch the jury returned a verdict for the defendant. From the judgment in both cases Cole has appealed. We affirm.

I

FACTUAL CLAIMS

Cole asserts a number of factual claims. First, he claims that his agreement with Merrill Lynch was to sell his entire block of CG shares rather than a contract to sell 5000 shares accompanied by a time limit option in Merrill Lynch to purchase the remaining shares at a stated price. He also claims that at the time of the transaction his mailing address was in Miami, Florida rather than his office at Hartford. The jury, in response to a specific interrogatory, found against Cole on the first claim and the court in its memorandum of decision specifically found against him on both claims. Since there was conflicting evidence on both claims, the resolution of these issues was for the determination of the trier. *Halperin* v. *Pine Plaza Corporation,* 180 Conn. 85, 87–88, 428 A.2d 340 (1980). Cole's challenge to the factual findings is nothing more than a request that we accept his version of the facts and this we cannot do because it is not our function to retry the case. *Edgewood*

*Construction Co., Inc.* v. *West Haven Redevelopment Agency,* 170 Conn. 271, 272, 365 A.2d 819 (1976).

## II

### EVIDENTIAL CLAIMS

Cole called Hedick as a witness. During direct examination Cole offered Hedick's notes as full exhibits. On cross-examination the court properly permitted inquiry into these notes. While it is settled Connecticut law that inquiry upon cross-examination is limited by the scope of the direct examination; *Grievance Committee* v. *Dacey,* 154 Conn. 129, 150, 222 A.2d 339 (1966), appeal dismissed, 386 U.S. 683, 87 S. Ct. 1325, 18 L. Ed. 2d 404, reh. denied, 387 U.S. 938, 87 S. Ct. 2048, 18 L. Ed. 2d 1006 (1967); that scope is determined by all of the evidence offered during direct examination. An exhibit offered and received as a full exhibit is in the case for all purposes. If admitted during direct examination it is as much a part of that examination as the testimony of witnesses. If Cole wished to preclude cross-examination with respect to the contents of the notes, he should not have offered them in evidence during the direct examination. *Robinson* v. *Faulkner,* 163 Conn. 365, 373, 306 A.2d 857 (1972). He could have had the notes marked for identification only and withheld the offer until Merrill Lynch presented its case. *Shulman* v. *Shulman,* 150 Conn. 651, 659, 193 A.2d 525 (1963).

Cole, who appeared pro se, called himself as a witness and was duly sworn. While on the stand he used certain notes in connection with his testimony. On cross-examination counsel for Merrill Lynch was permitted, over objection, to examine

these notes. Cole claims that since he acted in the dual capacity of an attorney and party litigant he had a right as an attorney to keep confidential his trial brief notes. The ruling permitting the notes to be examined was correct. If a witness, when testifying, uses a document to refresh his recollection, that document thereby becomes available for examination by the opposing party. *State* v. *Grimes,* 154 Conn. 314, 323, 228 A.2d 141 (1966) ; *Neff* v. *Neff,* 96 Conn. 273, 280–81, 114 A. 126 (1921). A pro se party who takes the witness stand is treated like any other witness. The fact that he is also an attorney does not ensconce him in a professional immunity blanket.

Cole's further claim that exhibits in the Merrill Lynch (court) case should not have been shown to the jury is without merit in view of the stipulation of the parties that "all evidence in both cases will be considered as evidence in both cases . . . ." Parties are not obliged to stipulate with regard to the reception and use of evidence but when they do they are bound by their action.

## III

### JURY INSTRUCTIONS

Cole argues that the charge was erroneous because it was delivered in a low monotone voice thus making it difficult to hear, it was not adapted to the issues, and it did not include his requested instructions. Cole having taken no exception to the substance of the charge nor to the manner of its delivery we do not consider these points nor do we consider whether the court erred in failing to give the requested instructions because of Cole's

failure to observe the rules of practice in this regard.[2] *Duley* v. *Plourde,* 170 Conn. 482, 488, 365 A.2d 1148 (1976).

## IV

### INTERROGATORIES

"The power of the trial court to submit proper interrogatories to the jury, to be answered when returning their verdict, does not depend upon the consent of the parties or the authority of statute law. In the absence of any mandatory enactment, it is within the reasonable discretion of the presiding judge to require or to refuse to require the jury to answer pertinent interrogatories, as the proper administration of justice may require." *Freedman* v. *New York, N.H. & H. R. Co.,* 81 Conn. 601, 612, 71 A. 901 (1909). Although ordinarily the submission of interrogatories rests within the court's discretion, where the complaint contains two or more counts, or when two or more causes of action are incorporated in a single count a party has the right to save himself from the implication of a general verdict by seeking from the jury answers to apt and proper interrogatories. *Gaulton* v. *Reno Paint & Wallpaper Co.,* 177 Conn. 121, 126, 412 A.2d 311 (1979); *Sheeler* v. *Waterbury,* 138 Conn. 111, 114–15, 82 A.2d 359 (1951). In this case the court did submit interrogatories and therefore the question is whether the questions submitted adequately protected Cole against a general verdict.

---

[2] Practice Book § 318 authorizes a party to file up to fifteen requests to charge "unless, for good cause shown, the court permits the filing of an additional number." Cole filed thirty-eight requests. It does not appear that Cole sought or received permission to file the additional requests. In these circumstances the trial judge is under no duty to select Cole's fifteen finalists among the thirty-eight contestants.

Cole's complaint is in six counts. The court directed a verdict on counts two, five and six[3] and submitted the case to the jury on counts one, three and four. The first count is based on a claimed breach of contract by Merrill Lynch to sell at bid market price Cole's block of CG shares of stock. In regard to this count the court submitted to the jury the following interrogatories: "1. Do you find that the plaintiff, Morton E. Cole, on February 20, 1974, gave an order to sell a 19,950 share block of CG stock at the 'bid market price' on February 20 or 21, 1974 to the defendant, Merrill Lynch, as alleged in the First Count? Yes ——— No ———; 2. If so, do you find that Merrill Lynch accepted that order on those terms? (If interrogatory 1 is answered "No," this interrogatory need not be answered.) Yes ——— No ———; 5. Do you find that the plaintiff, Morton E. Cole, agreed to sell to Merrill Lynch 5000 shares of CG at 51½ on February 20, 1974, as alleged in the defendants' Special Defense? Yes ——— No ———." Cole presses three interrogatories (Nos. 1, 7, and 8) pertaining to the first count all of which rely on an alleged agreement respecting a block sale of his CG stock.[4] The court's interrogatories covered this area adequately. Any additional interrogatories would have been redundant.

---

[3] Cole does not challenge the trial court's action in directing a verdict on these counts.

[4] The interrogatories proposed by Cole were as follows:

"1. Did Kinney, the account executive of Merrill Lynch on Wednesday, February 20, 1974, accept the Plaintiff's order to sell 19,950 shares of stock of Connecticut General Insurance starting on that day and through the next day, Thursday, February 21, 1974?

YES ( )          NO ( )

"7. Did the Defendant Merrill Lynch fail to make reasonable efforts to execute the Plaintiff's order to sell his 19,950 shares of

In the third count Cole charged Merrill Lynch and its employees Hedick and Kinney with fraud and deceit. In connection with this charge the court submitted to the jury the following interrogatory: "Do you find that Merrill Lynch, through Mr. Hedick or Mr. Kinney or both, made fraudulent representations to the plaintiff, known by them at the time to be untrue, with the intention of having the plaintiff rely on them; and that the plaintiff did so rely on them to his injury, as alleged in the Third Count? Yes ———— No ————." In his brief Cole does not contend that the interrogatory submitted by the court was deficient in any respect. His argument is that he was prejudiced by the court's failure to submit his interrogatory on this issue. An examination of his proposed interrogatory (No. 9) discloses that it is merely repetitious in that it asks whether Merrill Lynch through its employees committed fraud on Cole in connection with his efforts to sell his CG stock.

In the fourth count Cole claimed a fraudulent breach of trust. He specified a number of claimed misrepresentations and a concealment of a contemporaneous "short sale"[5] of CG stock. On this count

---

stock to an institutional buyer or buyers on February 20, 1974 or at any time thereafter?

YES ( )     NO ( )

"8. Did the defendant Merrill Lynch fail to make reasonable efforts to sell the 19,950 shares of stock in the ready or open market at any time between February 20, 1974 and the end of March 1974?

YES ( )     NO ( )"

[5] A "short sale" is "a sale of securities or commodities that one does not own but expects to buy later for future delivery or to replace those borrowed temporarily for immediate delivery." Webster, Third New International Dictionary.

The seller in a "short sale" hopes to buy an equivalent amount of stock at a lower price before the time of delivery. The hazard

the court submitted the following interrogatory: "4. Do you find that Merrill Lynch, through Mr. Hedick or Mr. Kinney, conspired to deceive the plaintiff by fraudulent misrepresentations or fraudulent non-disclosures, as alleged in the Fourth Count? Yes ——— No ———." Here again, Cole does not question the appropriateness of the interrogatory submitted. His claim is that the court should have submitted three additional interrogatories (Nos. 2, 3, and 23).[6] Two of these relate to the fact of the "short sale" about which there is no dispute and the third pertains to the claimed violation of fiduciary duties with respect to the sale or purchase of Cole's entire block of CG stock. The court having submitted a proper interrogatory on the subject matter, whether additional interrogatories should have been submitted was within

---

involved in a "short sale" is depicted in the old rhyme "He that sells what isn't his'n must buy it back or go to prison." White, The Book of Daniel Drew, p. 180 (1910).

[6] The requested interrogatories were as follows:

"2. Did the Defendant Merrill Lynch sell 11,000 or more shares of Connecticut General Insurance Company stock on the afternoon of Wednesday, February 20, 1974, for its own corporate trading account while it had an order of the Plaintiff to sell his 19,950 shares?

YES ( )          NO ( )

"3. If Merrill Lynch sold said 11,000 or more shares as described above in Interrogatory 2, did it do so while the Plaintiff and Hedick were negotiating for the purchase by Merrill Lynch between 2:30 and 3:30 o'clock on that afternoon of February 20, 1974 of the Plaintiff's 19,950 shares?

YES ( )          NO ( )

"23. Did Herbert Hedick and Merrill Lynch violate their fiduciary duties of trust as a broker or dealer to deal honestly and faithfully with its customer, the Plaintiff, and to make a reasonably prompt effort to sell at the best obtainable prices the Plaintiff's 19,950 shares or to buy those shares at a reasonably competitive price?

YES ( )          NO ( )"

the court's discretion. The court did not abuse its discretion by failing to include the proposed questions.

## V

### STATUTE OF FRAUDS

In the Merrill Lynch case Cole alleged as a special defense the applicable statute of frauds provision of the Uniform Commercial Code. General Statutes § 42a-8-319.[7] Merrill Lynch concedes that since the transaction respecting the 5000 CG shares was a sale between principals the statute is applicable. See *Lindsey* v. *Stein Bros. & Boyce, Inc.,* 222 Tenn. 149, 433 S.W.2d 669 (1968); *F. C. Adams* v. *Elmer F. Thayer Estate,* 85 N.H. 177, 155 A. 687 (1931) (pre-Code) aff'd, 86 N.H. 555, 156 A. 697 (1934) (interpreting Massachusetts law). It asserts, however, that the sending of the confirmation notice and Cole's failure to send a written objection within ten days of the receipt of this notice satisfied the requirements of the statute. We agree.

---

[7] "[General Statutes, Rev. to 1975] Sec. 42a-8-319. STATUTE OF FRAUDS. A contract for the sale of securities is not enforceable by way of action or defense unless (a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or (b) delivery of the security has been accepted or payment has been made but the contract is enforceable under this provision only to the extent of such delivery or payment; or (c) within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten days after its receipt; or (d) the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price."

The confirmation notice complied with the statute. It described the securities, stated the quantity of shares sold and the stated price. It was "signed" within the definition of § 42a-1-201 (39) which includes any symbol executed or adopted by a party with present intention to authenticate a writing. In the present circumstances a letterhead or billhead satisfies the signature requirement. *Shpilberg* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 535 S.W.2d 227, 229 (Ky. 1976).[8] The confirmation slip so signed was sufficient to bind the broker. Id. That being so, unless the contract was objected to by Cole within the statutory time limit, its enforceability could not be avoided by Cole on the ground of the statute of frauds.

The court found that the confirmation slip was mailed to Cole on February 21, 1974, at his office and mailing address at One Constitution Plaza and arrived there on February 22, 1974. The court was justified in so finding. There was evidence that the confirmation slip was mailed on February 21. There was also evidence that a confirmation slip sent to a Hartford address on February 21[9] would,

---

[8] The code comment appearing in General Statutes Annotated § 42a-1-201 (39) provides in part:

"Authentication may be printed, stamped or written; it may be by initials or by thumbprint. It may be on any part of the document and in appropriate cases may be found in a billhead or letterhead. No catalog of possible authentications can be complete and the court must use common sense and commercial experience in passing upon these matters. The question always is whether the symbol was executed or adopted by the party with present intention to authenticate the writing."

[9] There was evidence that Merrill Lynch sent out a confirmation notice on February 21 and a "securities due" notice on February 22. Although Cole claims that the confirmation notice was admitted by Merrill Lynch to have been mailed on February 22 his brief is barren of any reference to the transcript in support of this claim as required by Practice Book § 3060F (b).

in the ordinary course of mail, be delivered overnight or on February 22. The court in arriving at its conclusion of fact was justified in presuming that the confirmation slip was received in the due course of mail. *Console* v. *Torchinsky*, 97 Conn. 353, 356, 116 A. 613 (1922); *Pitts* v. *Hartford Life & Annuity Ins. Co.*, 66 Conn. 376, 384, 34 A. 95 (1895); McCormick, Evidence (2d Ed.) § 343, pp. 807–808. It is undisputed that Cole's written objection was not delivered until March 6, 1974, too late to enable him to rely on the defense of the statute of frauds.

## VI

### IMPACT OF SECURITIES ACT

In his fourth special defense Cole claimed that Merrill Lynch's action was barred by General Statutes § 36-346 (f) because of Merrill Lynch's violation of § 36-338 (a) (Rev. to 1975). The trial court ruled that § 36-346 protected only buyers of securities and therefore was unavailable to Cole as a seller. It also found that Cole had failed to sustain his burden of proof on this defense. Both the ruling and the finding raise issues which require further discussion.

Section 36-346,[10] entitled "Civil liability for sales

---

[10] "[General Statutes, Rev. to 1975] Sec. 36-346. CIVIL LIABILITY FOR SALES IN VIOLATION OF LAW. (a) Any person who offers or sells a security in violation of section 36-322 or 36-338 is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent per annum from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages shall be the amount that would be recoverable upon a tender, less the value of the security when the buyer disposed of it, and interest at six per cent per annum from the date of disposition.

"(b) Every person who directly or indirectly controls a seller liable under subsection (a) of this section, every partner, officer or

in violation of law" provides a variety of protections against security transactions made in violation of law. Subsection (a) gives a buyer a right of action against any person who offers or sells a security in violation, inter alia, of § 36-338. Subsection (f) bars an action by any person who has made a contract in violation of any provision of the chapter. This would include § 36-338. Subsec-

director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale and every broker or dealer or salesman who materially aids in the sale shall be liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There shall be contribution as in cases of contract among the several persons so liable.

"(c) Any tender specified in this section may be made at any time before entry of judgment.

"(d) Every cause of action under this chapter survives the death of any person who might have been a plaintiff or defendant.

"(e) No person may sue under this section more than two years after the contract of sale. No person may sue under this section (1) if the buyer received a written offer, before suit and at a time when he owned the security, to refund the consideration paid, together with interest at six per cent per annum from the date of payment, less the amount of any income received on the security, and he failed to accept the offer within thirty days of its receipt, or (2) if the buyer received such an offer before suit and at a time when he did not own the security, unless he rejected the offer in writing within thirty days of its receipt.

"(f) No person who has made or engaged in the performance of any contract in violation of any provision of this chapter or any regulation hereunder, or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any suit on the contract.

"(g) Any condition, stipulation or provision binding any person acquiring any security to waive compliance with any provision of this chapter is void.

"(h) The rights and remedies provided by this section are in addition to any rights and remedies that may exist at law or in equity, but this chapter shall not create any cause of action not specified in this section."

tion (h) provides that the rights and remedies of this statute are in addition to any rights and remedies that exist at law or in equity "but this chapter shall not create any cause of action not specified in this section." While it may be said that § 36-346 (a) provides only a buyer with a sword, subsection (f) provides both buyer and seller with a shield.

Section 36-338 prohibits certain activities in connection with the sale or purchase of any security. Because this statute is modeled after § 10 (b) of the Securities Act of 1934 and § 17 (a) of the Securities Act of 1933, we may look to decisions under the federal law for guidance. *Elida, Inc.* v. *Harmor Realty Corporation,* 177 Conn. 218, 226, 413 A.2d 1226 (1979).

We begin with an analysis of the relationship between a broker-dealer and his customer. As a broker he acts as an agent with all of the responsibility to his customer that such status implies. But even when, as a dealer in his own securities, he acts as a principal in relation to his customer he is not free to operate under the principle of *caveat venditor.* "Inherent in the relationship between a dealer and his customer is the vital representation that the customer will be dealt with fairly, and in accordance with the standards of the profession." *Duker & Duker,* 6 S.E.C. 386, 388 (1939). "The theory is that even a dealer at arm's length impliedly represents when he hangs out his shingle that he will deal fairly with the public." 3 Loss, Securities Regulation (2d Ed. 1961) p. 1483. The "shingle" theory, first recognized by the federal courts in the case of *Charles Hughes & Co., Inc.* v. *S.E.C.,* 139 F.2d 434, 435-36 (2d Cir. 1943), cert. denied, 321 U.S. 786, 64 S. Ct. 781, 88 L. Ed. 1077

(1944), has become a well established doctrine in the securities field. Loss, op. cit., 1487. See *S.E.C.* v. *Capital Gains Bureau,* 375 U.S. 180, 186, 84 S. Ct. 275, 11 L. Ed. 2d 237 (1963).

Section 36-338 (a) (2) imposes upon a dealer in securities a special duty not to "make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . ." Cole claims that, at the very time Merrill Lynch was offering to buy from Cole 5000 CG shares at $51.50, Merrill Lynch had already sold short 11,000 CG shares at more than $52 a share and that, by failing to disclose this short sale transaction, Merrill Lynch violated § 36-338 and therefore is barred from recovering for breach of contract by virtue of § 36-346 (f). It is undisputed that Merrill Lynch did not disclose the short sale to Cole. If this sale, or any significant part of it, occurred before the 5000 share transaction then Merrill Lynch's duty to disclose is clear and its failure to do so would bar any suit to recover any losses resulting from the breach of contract. General Statutes §§ 36-338, 36-346 (f).

In this case, however, Merrill Lynch in answer to Cole's motion for disclosure asserted that "[o]n 2-20-74, after it had agreed to purchase such [5000] shares from the defendant [Cole], the plaintiff [Merrill Lynch] sold 2000 shares to Shield & Co., and 3000 shares (as part of an 8000 share order) to Investment Company of America. Both transactions were as principal." At the trial the parties stipulated to the same effect. Although Cole maintained that, at all times, the transaction involved only the sale of his entire block of CG shares, the

court was not obliged to accept his version of the facts. The court having found that the agreement was for the purchase by Merrill Lynch as principal of 5000 shares together with a time limit option to purchase the remainder, the stipulation of the parties established the time frame of that purchase and the subsequent short sale. In these circumstances, even under the "shingle" theory, there was nothing for Merrill Lynch to disclose. Obviously, had Merrill Lynch exercised its option to purchase the remaining shares it would have also been obligated to disclose the earlier short sale.

Cole's further contention that the amount of damages was incorrectly calculated is without merit. The court awarded Merrill Lynch the difference between the cost of purchasing 5000 CG shares in the open market and the contract price. This represented Merrill Lynch's loss which resulted from Cole's breach of contract and was the correct measure of damages. It is analogous to the damages which the Uniform Commercial Code makes available to a buyer of goods who, because of a seller's breach, is obliged to "cover" the contract by procuring substitute goods. General Statutes § 42a-2-712.[11] White & Summers, Uniform Commercial Code (2d Ed.) § 6-3 p. 216ff.

---

[11] "[General Statutes, Rev. to 1975] Sec. 42a-2-712. 'COVER'; BUYER'S PROCUREMENT OF SUBSTITUTE GOODS. (1) After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

"(2) The buyer may recover from the seller as damages the difference between the cost to cover and the contract price together with any incidental or consequential damages as defined in section 42a-2-715, but less expenses saved in consequence of the seller's breach.

"(3) Failure of the buyer to effect cover within this section does not bar him from any other remedy."

## VII

### VEXATIOUS SUIT

In the Merrill Lynch case Cole filed a cross complaint against Merrill Lynch alleging that its action constituted a vexatious suit. The trial court found that Cole had failed to prove the allegations of his cross complaint and rendered judgment for the defendant Merrill Lynch. We agree. To establish a cause of action for vexatious suit requires proof that a civil action has been prosecuted not only without probable cause but also with malice. *Bridgeport Hydraulic Co.* v. *Pearson,* 139 Conn. 186, 194, 91 A.2d 778 (1952); *Calvo* v. *Bartolotta,* 112 Conn. 396, 397, 152 A. 311 (1930). It must also appear that the litigation claimed to be vexatious terminated in some way favorable to the defendant therein. *Frisbie* v. *Morris,* 75 Conn. 637, 639, 55 A. 9 (1903). If, as in this case, such litigation terminates in favor of the plaintiff therein such judgment is as a general rule conclusive of the existence of probable cause for the institution of the suit. Id., 639–40.

Cole's remaining claims whether legal or factual do not require discussion. It is sufficient to note that we have examined these claims carefully and conclude that they are without merit.

There is no error.

In this opinion the other judges concurred.