[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action was initiated by the Commissioner of the Department of Children and Families (hereinafter D.C.F.) to terminate the parental rights of Evangelisto R. in and to his then three year old son Vincento N. The petition was filed on August 5, 1993. On December 14, 1993, Evangelisto filed a motion to dismiss for lack of subject matter jurisdiction[1]. Although jurisdictional claims take precedence and should be acted on promptly, Statewide Grievance Committee v. Rozbicki,211 Conn. 232, 245 (1989), certain contentions of the respondent prompted the court to announce that its ruling on the motion would be rendered in conjunction with its decision on the subsequently held trial.
 I.
As stated in the motion and in parties' briefs, the jurisdictional claims appear to be three-fold. First is the contention that the termination petition was untimely brought so Evangelisto would be unable to be present at the proceedings since after he was served he was deported to Santo Domingo in the Dominican Republic. Second is the seemingly related claim that service of the petition when deportation was known to be imminent in and of itself caused a divestiture of subject matter jurisdiction. The third argument predicated on Mathews v.Eldridge, 424 U.S. 319, 96 S.Ct. 803, 47 L.Ed.2d 18 (1976) is that the procedures utilized (and by implication to be utilized) have (and will) violate procedural due process.
When the motion to dismiss was heard, no testimony was offered and no affidavits were submitted. See Practice Book § 143. Nevertheless, there is sufficient evidence for decision-making. CT Page 6914-A In the file there is a postal green card showing that the respondent was served with a copy of the petition by certified mail addressed to him in care of a county sheriff in Hyde Park, Vermont. The petitioner's brief acknowledges respondent's Vermont confinement and admits that "[s]ometime in September, 1993, Mr. R. was deported from the United States to Santo Domingo in the Dominican Republic."
Evangelisto's first and second arguments for dismissal seek to implicate the Sixth and Fourteenth Amendments to the Constitution of the United States and by analogy the language of F.R.Crim.P. 43. At oral argument, his attorney cited several decisions from the United States Supreme Court and the Federal Courts of Appeal. In so far as the federal decisions are concerned, a defendant's right of presence is included in the confrontation clause of the Sixth Amendment, Illinois v. Allen,397 U.S. 337, 338, 90 S.Ct 1057, 25 L.Ed.2d 1053, reh. denied398 U.S. 915, 90 S.Ct. 1684 26 L.Ed.2d 80 (1970), and it along with the correlative Sixth Amendment right to present a defense,Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct 1920,18 L.Ed.2d 1019 (1967) are applicable to the states through the due process clause of The Fourteenth Amendment. United States v.Washington, 705 F.2d 489, 496 (D.C. Cir. 1983). The federal decisions, however, are uniform in limiting the Sixth Amendment rights and the provisions of Rule 43[2] to criminal trials.Illinois v. Allen, supra; United States v. Zuker, 161 U.S. 475,481, 16 S.Ct. 641, 40 L.Ed.2d 777 (1896); United States v.Washington, supra at 497. The same limitation has been placed upon the similar language of Article First § 8 of the Constitution of Connecticut. State v. Anonymous, 179 Conn. 155,159 (1979).
In juvenile proceedings, there is a statutory right of confrontation for children and their parents. General Statutes § 46b-135(b). If Evangelisto were in this jurisdiction he undoubtedly would have had the right to be present at the trial.In re Jonathan P., 23 Conn. App. 207, 212 (1990). It has been implied, however, that the statutory right of confrontation is less expansive in scope than its constitutional counterpart.See In re Noel M., 23 Conn. App. 410, 420-22 (1990). Moreover, in termination actions, service by certified mail is permitted for out-of-state respondents. General Statutes § 45a-716(c). And the court's ability to proceed with a termination trial is not dependent upon a respondent's physical presence. See In reJuvenile Appeal (Docket No. 10155), 187 Conn. 431, 437-38
CT Page 6914-B (1982).
Unlike Evangelisto's other arguments for dismissal which rely on fixed points in the proceedings, due process is flexible and takes into account all relevant facts and circumstances of the particular situation. Mathews v. Eldridge, supra at 334;State v. Paulino, 223 Conn. 461, 480 (1992). It was Evangelisto's reliance upon due process as a ground for dismissal that caused the court to defer action on the motion until after the trial.
In this case, due process has two facets one of which is that a due process violation occurs when witnesses are made unavailable by the conduct of government. United States v.Mendez-Rodriguez, 450 F.2d 1, 5 (9th Cir. 1971). The court does not disagree with the characterization by the Evangelisto's attorney of his client as a witness; but in making the claim, counsel ignores the positions of the two sovereigns involved. From the testimony of some of the social workers, the court finds that before the petition was served, D.C.F. was aware that Evangelisto was to be deported. There was no proof, however, that D.C.F. employees had promoted, aided or cooperated in any way with the federal authorities in making Evangelisto available for deportation. Under these circumstances the deportation as a violation of due process cannot be charged against D.C.F. SeeFerrari v. United States, 249 F.2d 132, 141 (9th; Cir.) cert. denied sub nom. Cherpakov v. United States, 355 U.S. 873,78 S.Ct. 124, 2 L.Ed. 2 78 (1957).
The other and principal aspect of due process concerns the three-part criteria of Mathews v. Eldridge, supra at 335 which our Supreme Court, in In re Juvenile Appeal (Docket No. 10155),supra at 435, stated is to govern the question of due process rights in termination trials. The three parts, described inMathews v. Eldridge as three distinct factors are (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the state's interest including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. The three factors have been described as a balancing test both with respect to each other and to other issues in the particular case. Lassiter v.Department of Social Services of Durham County, 452 U.S. 18, 27, CT Page 6914-C101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) reh. denied 453 U.S. 927,102 S. Ct 889, 69 L.Ed.2d 1023 (1981); In re JuvenileAppeal (Docket No. 10155), supra at 435.
No dispute can exist regarding the first factor. A parent's interest in retaining his parental rights is compelling as well as constitutionally protected. In re Juvenile Appeal(Docket No. 10155), supra at 436. Similarly there is no dispute as to the portion of the third factor that identifies the state's interest. With regard to children, the state acts as parens patriae to insure a safe and nurturing environment. Id. at 439-40.
At issue here is the second factor, the risk of error occasioned by the respondent's absence from the termination hearing. The hallmark of due process is an opportunity to be heard at a meaningful time in a meaningful manner before a decision is made concerning a party's rights. Mathews v.Eldridge, supra at 333. In the court's view, it is noteworthy that the two Connecticut cases dealing with the absence of a parent from a termination hearing, In re Juvenile Appeal DocketNo. 10155, supra and In Re Jonathan P., supra, both involved fathers who wanted to be in attendance and to participate in the trial. No such desire was evident in this case.
Upon inquiry from the court, Evangelisto's attorney reported that after the deportation, he wrote one letter to his client at an address in the Dominican Republic supplied by Evangelisto's mother who resides in New York. The letter was not returned. Counsel, however, received no answer to it. Nor had counsel ever received any post-deportation communication from his client.
In the absence of contrary evidence, the court is entitled to presume that a letter placed in the mails was in fact delivered[3]. Merrill Lynch, Pierce, Fenner Smith, Inc. v.Cole, 189 Conn. 518, 533 (1983). An answer to counsel's single letter or another communication from Evangelisto could have encouraged the following actions: an arrangement with the Attorney General of the United States for permission to enter the country for the purpose of contesting the termination petition, 8 U.S.C. § 1326(2), see United States v. Dalli,424 F.2d 45, 48 (1970); a request to the court that the state pay for the cost of Evangelisto's transportation, see In re JuvenileAppeal (Docket No. 10155). supra at 439 or at least a request to CT Page 6914-D provide for the telephonic hookup transcript review procedure sanctioned in In re Juvenile Appeal (Docket No. 10155), supra at 438.
With respect to the remaining components of the second and third factors of Mathews v. Eldridge, supra, concerning the probable value, if any, of additional or substitute procedural safeguards and their costs and other burdens, little needs to be said. For persons outside of the state, service of process in termination actions is by certified mail or by publication in a newspaper. General Statutes § 45a-716(c). Such provisions for service are necessitated by the nature of a termination action and by the mobility of persons in present day society.
A court has jurisdiction over the subject matter if it has the authority to decide the particular type of legal controversy. Subject matter jurisdiction relates to the court's competency to exercise power and not to the manner in which that competency is exercised. Plasil v. Tableman, 223 Conn. 68, 80
(1992). It is highly doubtful that the respondent's due process arguments fall within the rubric of subject matter jurisdiction.See State v. Malkowski, 189 Conn. 101, 105 (1983). The due process contention, however, as well as the others have been considered. None of the respondent's claims present valid attacks upon the court's subject matter jurisdiction. The motion to dismiss is denied.
 II.
Before proceeding to the merits of D.C.F.'s allegations, mention should be made of the structure of a termination case. A trial on a petition to terminate parental rights consists of two phases, adjudicatory and dispositive. Practice Book §§ 1042.1, 1043.1. The two phases, however, do not have to be the subjects of separate hearings. One unified trial is permissible. In re Juvenile Appeal, (84-AB), 192 Conn. 254, 259
(1984).
Although the procedure of one trial is approved, the two phases serve distinctive purposes. In the adjudicatory phase, the court determines the validity of the grounds alleged in the petition and, hence, is limited to events preceding the filing date of August 5, 1993. The dispositive phase is concerned with what action should be taken in the best interest of the child and, as to that phase, the court is entitled to extend its CT Page 6914-E consideration to matters occurring until the end of the trial which, in this case, was January 24, 1994.[4] In re JuvenileAppeal (84-AB), supra at 267 n. 14. The dispositive phase is never reached unless one of grounds is proven in the adjudicatory phase by clear and convincing evidence. General Statutes § 17a-112(b); In re Migdalia M., 6 Conn. App. 194, 208, cert. denied, 199 Conn. 809 (1986).
Two grounds, abandonment and the failure of a parent, of a child previously found to be neglected or uncared-for, to achieve the requisite degree of personal rehabilitation are alleged to have occurred for more than one year. General Statutes § 17a-112(b)(1) and (2). At least one of these grounds must be proven by clear and convincing evidence in order to reach the dispositive phase. Then the court must base its determination upon what is proven by clear and convincing evidence to be in the best interest of the child.
Clear and convincing evidence, the required standard of proof, has been defined both quantitatively and qualitatively. The quantitative definition is that clear and convincing evidence is the level of persuasion lying between the usual civil requirement of proof by a fair preponderance of the evidence and the requirement in criminal cases of proof beyond a reasonable doubt. Qualitatively, clear and convincing evidence is proof sufficient to satisfy a court beyond an average certainty. In re Shannon S., 41 Conn. Sup. 145, 150
aff'd. 19 Conn. App. 20 (1989).
 III.
From the evidence presented and the inferences properly drawn therefrom, the court finds the following facts to have been established in the adjudicatory phase of the trial.
When Vincento was born on June 23, 1990, his mother, Anita N. and siblings were living with her mother. There was no room for the newborn so Anita placed him voluntarily with D.C.F. Later, when Anita obtained her own apartment she was having trouble with her other children so Vincento was not returned to her. At the time of birth, Anita was not sure whether Evangelisto was the father. Evangelisto had asked to see Vincento on July 2, 1990, one week after the child's birth.
In November or December of 1990, D.C.F. placed Vincento in CT Page 6914-F another foster home. Anita had requested placement as she was overwhelmed by her other children. A petition to terminate parental rights in Vincento was begun and dropped. A termination action was finalized, however, for Anna, another child of Anita and Evangelisto, who was born nine months before Vincento. Evangelisto participated in the trial concerning Anna.
On April 1, 1991, a petition was filed alleging that Vincento was a neglected and uncared-for child. In that petition the father was listed as "unknown".[5] Disclosures from Anita, however, prompted the filing of a similar petition naming Evangelisto as the father on August 1, 1991. Service was accomplished on Evangelisto on August 26, 1991. Paternity was denied until January 13, 1992 when a blood test showed Evangelisto to be the father.
The result of the neglected-uncared-for petitions was that Vincento was committed to D.C.F. on January 14, 1992 as an uncared-for child. On June 17, 1993, the commitment was extended. Not having heard from his client, Evangelisto's attorney entered a pro forma objection. The expiration date of the extended commitment is January 14, 1995.
When Vincento was originally committed in January 14, 1992, Evangelisto was incarcerated in the Bridgeport Correctional Center. As part of the uncared-for judgment, expectations were set for both parents. With respect to Evangelisto, the expectation concerning visitation read "Father to visit as requested and facilitated through D.C.Y.S".[6]
Evangelisto was incarcerated much of the time between January 14, 1992, the date of the initial uncared-for commitment and August 5, 1993 the date the termination petition was filed. He started out in the Cheshire Correctional Center and then he went to Operation Crossroads, a drug rehabilitation program in New Haven. After being dismissed from Operation Crossroads, Evangelisto was sent to the Bridgeport Correctional Center. He was returned to Operation Crossroads and released on April 15, 1993. From that date until July, 1993, D.C.F. did not know where Evangelisto was until notification of the Vermont confinement came from the Department of Immigration and Naturalization. Another expectation was that both parents were to keep their whereabouts known to D.C.Y.S. and their respective attorneys. CT Page 6914-G
Not until Evangelisto was confined to the Bridgeport Correctional Center did he request one or two visits with Vincento. The D.C.Y.S. social workers did not facilitate the first request because they, or some of them, did not believe in taking children to correctional institutions. By the time the second request was made, both Evangelisto and D.C.F. knew that he was going to be deported. D.C.F. consulted with a psychologist, Dr. Krieger, who advised against starting visits with a father who was soon to be expelled from the country. Dr. Krieger's opinion was made known to Evangelisto and his lawyer. The court was not made aware of Dr. Krieger's activity in the case.
In contrast with the reticence shown by the D.C.F. workers regarding Vincento's visits with Evangelisto in a jail was the treatment given to Evangelisto's mother whom he had suggested as a placement resource. Before withdrawing as a placement candidate in December, 1992, Evangelisto's mother had several visits with Vincento at the Waterbury D.C.F. office. Proceedings under the Interstate Compact had been initiated. Vincento would visit with his grandmother only in the presence of the foster-mother. He referred to the foster parents as "mommy" and "daddy."
When one parent is incarcerated, D.C.F. holds treatment plan reviews at the correctional center. In December, 1992, a D.C.F. social worker at a treatment plan review discussed with Evangelisto the decision of his mother not to care for Vincento, and the decision of D.C.F. to file a termination petition. Evangelisto said that he knew that he would be deported and he also knew that he would return to the United States.[7] At Operations Crossroads, however, Evangelisto was not considered to be incarcerated. During these time periods treatment plan reviews were conducted only at the D.C.F. office and the parent who is at Operation Crossroads (or some similar facility) is invited to attend. Evangelisto and his Crossroads counselor attended one such review session in August, 1991.
When Evangelisto was at Operation Crossroads he was able to take the bus to Waterbury, where he visited twice with Vincento and Vincento's mother at the D.C.F. Office. These two visits constituted the limits of Evangelisto's association with his son. He never sent cards, letters or gifts to the child. Vincento has never asked about his father. CT Page 6914-H
 III.
Abandonment, the first ground asserted in the petition, is defined by § 17a-112(b)(1) as a parent's failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." The statutory definition differs from the common law concept of abandonment wherein an intent to abandon totally and permanently must be proven. See e.g.,Litvaitis v. Litvaitis, 162 Conn. 540, 547 (1972); Kantor v.Bloom, 90 Conn. 210, 213 (1916). For statutory abandonment, the focus is on a parent's conduct. In re Michael M., 29 Conn. App. 112,121 (1992).
In In re Rayna M., 13 Conn. App. 23, 36-37 (1987), the Appellate Court discussed statutory abandonment in the context of the parental responsibilities noted by the Supreme Court inIn re Juvenile Appeal (Docket No. 9489), 183 Conn. 11 (1989). Described as "commonly understood general obligations of parenthood," these responsibilities involve at a minimum: "(1) expressions of love and affection for the child; (2) expressions of personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." Id. at 15.
The extent to which a specific parent should be held to the performance of all or some of the above stated obligations depends on large part on the particulars of a case. Abandonment is a question of fact to be resolved by the trial court in the light of relevant circumstances. In re Juvenile Appeal (DocketNo. 9489), supra at 14. Consideration must be given to Evangelisto's status as a non custodial parent who, during the time period in question, was either incarcerated or a participant in a drug treatment program. A parent's incarceration does not alone constitute abandonment. In re Juvenile Appeal (DocketNo. 10155), supra at 443; In re Juvenile Appeal (84-6), 2 Conn. App. 705,711; In re Shannon S., supra at 153.
The restrictions on movement that are inherent to incarceration, however, do not excuse Evangelisto's failure to make use of available, albeit more limited, resources for communicating with Vincento, and this is so notwithstanding the failure of D.C.F. to respond to his two requests that Vincento be brought CT Page 6914-I to the Bridgeport Correctional Center for visits. Attempts to achieve contacts with a child by means of telephone calls, and sending cards, letters and gifts are indicia of interest, concern and responsibility for the child's welfare. In reMichael M., supra at 121.
Assuming that Evangelisto lacked money to purchase gifts or furnish support still leaves unexplained the total lack of communication that has occurred. His nomination of his mother as possible custodian might be viewed as an attempt to meet parental obligations in the future, but the court is concerned with the present. A parent must maintain a reasonable degree of interest in the welfare of his child. The verb "maintain" appearing in § 17a-112(b)(1) implies a continuing reasonable degree of concern. In re Rayna M., supra at 37-38; In reMigdalia M., 6 Conn. App. 194, 208-09, cert. denied, 199 Conn. 809
(1986). From the facts of this case, the court concludes that Evangelisto has certainly not maintained the required parental interest. Evangelisto's abandonment of Vincento was proven by clear and convincing evidence.
 B.
The second ground asserted for termination is that after the adjudication on January 14, 1992, where in Vincento was found to be an uncared for child, Evangelisto failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering Vincento's age and needs, he could assume a responsible position in the child's life. § 17a-112(b(2). The phrase "personal rehabilitation" as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. In reRayna M., supra at 32; In re Migdalia M., supra at 203. What is a reasonable time is invariably a question of fact to be governed by surrounding circumstances. Northeast ElectricalContractors v. Udolf, 1 Conn. App. 169, 172 (1984).
As the facts in this case demonstrate, Evangelisto never utilized the role of a parent. He denied paternity and when his kinship with Vincento was established, he pleaded nolo contendere to the allegations of the earlier petition and consented to the child's commitment. Aside from two visits and a desire to have Vincento placed with his mother, Evangelisto has had no interaction with his son. The child never mentions his father. When the present petition was filed, Evangelisto was confined CT Page 6914-J awaiting deportation, a further impediment to personal rehabilitation as a parent.
Vincento's age and needs present some other fact-based questions. A few additional findings are in order. The child is developmentally delayed and attends occupational and physical therapy sessions twice per week at a rehabilitation center operated by Easter Seals. His therapy requires consistency and practice at home. In the foster home, this need is met. These needs cannot be satisfied by Evangelisto.
Clear and convincing evidence established that Evangelisto has not been personally rehabilitated at all, much less to the degree envisioned by § 17a-112(b)(2). Within a reasonable time, he could not assume a responsible position in the child's life.
 IV.
Mentioned earlier was that a conclusion that one or more statutory grounds for termination had been proven does not automatically result in parental rights being terminated. The court must also determine from clear and convincing evidence that a termination of rights would be in the child's best interest. In re Nicolina J., 9 Conn. App. 598, 602, cert. denied 203 Conn. 804 (1987). To assure that mandate, the court is required to make dispositional findings on each of the six criteria enumerated in General Statutes § 17a-112(d). In reRomance M., 229 Conn. 345, 354-55 (1994). The six dispositional findings are set forth below.
1. D.C.F. offered Evangelisto the opportunity to visit with Vincento when he was under the care of Operation Crossroads. While Evangelisto was at Operation Crossroads he was notified of treatment plan reviews and encouraged to attend. During the times that Evangelisto was incarcerated, the treatment plan reviews were conducted at the correctional center where he was an inmate.
2. Included in the expectations approved by the court in the uncared-for disposition of Vincento on January 14, 1992 was that the "father to visit as requested and facilitated through D.C.Y.S." To the court the meaning of this expectation is clear. When Evangelisto, who was incarcerated at the time, asked to see the child, the agency was to assist in the accomplishment of the visits. While in jail, Evangelisto made CT Page 6914-K two requests for visits both of which were ignored. The agency should appreciate that the court ordered expectations are binding on it as well as the parents. In a closer case than this one, non compliance with visitation provisions could be fatal to D.C.F.'s position. Here, the situation was mitigated by D.C.F.'s bonafide attempt to keep Vincento in Evangelisto's family through the investigation and encouragement of his mother as a placement resource. Also, when the second request was made by Evangelisto's counselor at the Bridgeport Correctional Center, the D.C.F. worker told him to contact Evangelisto's attorney. There was no evidence that a claimed default in the performance of an expectation by D.C.F. was brought to the attention of the court.
3. The child, Vincento, has no feelings or emotional ties for or to his father. He views his mother as a friend who comes occasionally to visit the (foster) family. The child's feelings and emotional ties are for and to Robert and Linda P. his foster parents to whom he refers as "mommy" and "poppy". The P.'s hope to adopt Vincento. The child's mother favors the adoption. When questioned about parentage by D.C.F.'s adoption specialist, Vincento said that he does not want to leave the P. household.
4. Vincento is now four years old.
5. Evangelisto was successful in moving from the Bridgeport Correctional Center to Operation Crossroads (2d time). He asked his mother to take Vincento. If the paternal grandmother had not withdrawn herself from consideration, the child might have been a member of her household. After the deportation of Evangelisto to the Dominican Republic, nothing is known about his circumstances.
6. Evangelisto's own conduct prevented him from having a meaningful relationship with Vincento. That conduct has been described in part II, supra. Since he has been deported, the absence of cards or letters from father to son has continued.
After all that has been said, the choice in this case is very simple. There is a stable foster home where Vincento is known and loved and where, through adoption, he can become a dejure member of the family. His mother favors the adoption. On the other hand is a father, now in a foreign country, who rarely, if ever, paid attention to him, who he does not know and for whom he has no emotional ties. Obviously, a termination of CT Page 6914-L Evangelisto's parental rights is in Vincento's best interest.
 V.
A termination of the parental rights of Evangelisto R. in and to his son Vincento N. is ordered. Pursuant to General Statutes § 17a-112(f) and (g), the Commissioner of The Department of Children and Families is appointed statutory parent to place Vincento in adoption. Pursuant to § 17a-112(i), the statutory parent shall report to the court within 90 days on a case plan, as defined by the Federal Child Welfare Act of 1980, for Vincento. At least every 12 months thereafter until Vincento's adoption has been finalized, D.C.F. shall make a report to the court on the implementation of the plan.
BARNETT, J.