### VICTOR R. MATHER ET AL. *v.* THE GRIFFIN HOSPITAL ET AL. (13154)

HEALEY, SHEA, CALLAHAN, GLASS and HULL, Js.

Argued December 11, 1987—decision released April 19, 1988

*Cushing O. Condon II,* pro hac vice, with whom were *Victor G. Gleser,* pro hac vice, and, on the brief, *D. Jeffrey Burnham,* for the appellant (named defendant).

*Bruce D. Jacobs,* with whom were *Wesley W. Horton* and, on the brief, *Stanley A. Jacobs, Carol Wolven Hopkins* and *Alexandra Davis,* for the appellees (plaintiffs).

HULL, J. The defendant Griffin Hospital appeals from a judgment rendered on a jury verdict in this medical malpractice case. The minor plaintiff, Victor R. Mather,[1] brought this action through his mother and next friend, Mohana Mather, against the hospital and Radoslav Maric, a physician, alleging that their negligence in his delivery and immediate postdelivery treatment resulted in cerebral palsy. The jury returned a verdict in the favor of Maric but found the hospital liable and assessed damages against it in the amount of $9 million. We find no error.

---

[1] Victor's father, Jayantha Mather, was also a plaintiff in this action, seeking damages for medical and other expenses incurred in Victor's care and treatment.

The jury could reasonably have found the following facts. Victor, who was just over three years old at the time of trial, was born at 3:41 a.m., on February 25, 1983. He was delivered by Maric at Griffin Hospital (hospital). At birth, Victor took a breath, cried, moved his extremities and opened his eyes. Maric suctioned some fluid from Victor's mouth and nose, cut the umbilical cord and turned him over to Dorothy Thompson, the delivery room nurse, while Maric turned his attention to the child's mother. Within approximately two or three minutes after delivery, Victor's condition began to deteriorate and he had trouble breathing. Thompson suctioned some slightly bloody fluid from Victor's stomach and forced oxygen into his lungs using positive pressure equipment. Victor did not respond and stopped breathing altogether. Maric suctioned more fluid from Victor's stomach and then inserted an endotracheal tube into his windpipe. Before administering oxygen through the tube, he attempted to suction fluid from the baby's lungs by inserting a suction tube within the endotracheal tube. The suction tube given to Maric by Thompson, however, was too large to insert through the endotracheal tube. Thompson did not respond to Maric's request for a smaller suction tube, and when he asked for a larger endotracheal tube, she gave him the same sized tube as before. As a result, Maric had to remove the endotracheal tube to suction Victor's lungs and reinsert it to administer oxygen. Victor's condition continued to worsen. Maric then asked Thompson for an "Ambu bag," a type of oxygen delivery device, which he intended to attach to the endotracheal tube to create a "closed system" to maximize the flow of oxygen to Victor's lungs. An Ambu bag has a mask attached to it; when it is removed, the bag can be connected to an endotracheal tube to deliver oxygen directly to the lungs. He attempted, without success, to remove the mask. He then told Thompson to do so.

She was unable to remove the mask and, consequently, it could not be connected to the endotracheal tube. The mask was then placed over the child's nose and mouth and the oxygen administered. By this time, Victor was severely cyanotic, his color having turned dark blue to almost black from oxygen deprivation. Finally, Maric administered oxygen by blowing air from his mouth into Victor's lungs through the endotracheal tube. At twelve minutes of life, the baby was breathing on his own. Shortly thereafter, he was transferred to the neonatal nursery. During the next several hours, Victor suffered several tremors or seizures.

After two days, Victor manifested difficulty sucking, had trouble breast feeding and had to be bottle-fed. He also became jaundiced due to elevation of his bilirubin level. This condition persisted throughout his hospital stay. On March 1, 1983, Victor and his mother were discharged with instructions to see Laura Ment, a pediatric neurologist recommended by Victor's pediatrician.

The following day, Victor was seen by Ment. She admitted Victor to the Yale-New Haven Hospital newborn special care unit for treatment of hyperbilirubemia and dehydration. He was discharged from Yale-New Haven Hospital on March 8, 1983, with a diagnosis of birth asphyxia. Over the next several months, Victor displayed marked developmental delay, abnormal neurological findings and subnormal head growth. Gerald Germano, Victor's pediatrician, diagnosed Victor's condition as "severe developmental delay and choreoathetoid cerebral palsy secondary to neonatal asphyxia" occurring between birth and Germano's first examination of Victor at twenty to twenty-five minutes of life. At one year of age, Victor was referred to S. Nallainathan, a neurologist, for an examination. Nallainathan detected atrophy of Victor's brain and attributed both this condition and his seizures to a lack of oxygen some time around birth.

Following a trial lasting more than one month, the jury returned its verdict. The hospital moved to set aside the verdict and for judgment in accordance with its motion for a directed verdict. Both motions were denied. The hospital appeals on the following grounds: (1) the medical testimony failed to establish that the hospital's acts caused Victor's injuries; (2) the verdict was excessive as a matter of law and not supported by the evidence; and (3) the standard for measurement of damages used by the trial court was conceptually incorrect.[2] We hold that the evidence adequately supports the jury's verdict as to both liability and damages and that the amount of the verdict was not excessive as a matter of law. We further hold that the standard for measurement of damages used by the trial court was not conceptually incorrect.

## PROXIMATE CAUSE

Following the trial, the hospital moved for judgment in accordance with its motion for a directed verdict which was made but not resolved at trial. The hospital asserted before the trial court that there was no evidence as to the standard of care required of the hospital or any opinion evidence as to whether there had been a breach of the standard of care required. On appeal, the hospital contends that there was no competent expert testimony to establish the causal link between Victor's injuries and the hospital's acts or

---

[2] In its posttrial motions and in its preliminary statement of issues, the hospital enumerated other claims of error pertaining to the legality of the verdict, the qualifications of the economist and admission of some of his testimony, the court's rulings on admission of evidence, its failure to charge the jury as requested by the hospital and aspects of its charge to the jury. The hospital has not briefed these issues and we, accordingly, deem them to have been abandoned. *Hartford National Bank & Trust Co.* v. *Tucker,* 178 Conn. 472, 475, 423 A.2d 141 (1979), cert. denied, 445 U.S. 904, 100 S. Ct. 1079, 63 L. Ed. 2d 319 (1980).

omissions. It also argues that there was evidence of many potential causes for Victor's condition and that the jury could not reasonably have ascribed his condition to actions by the hospital. It claims, therefore, that it was error for the trial court to have denied its motion for judgment in accordance with its motion for a directed verdict. We disagree.

Our review of the trial court's refusal to direct a verdict requires us to consider the evidence in the light most favorable to the prevailing party, according particular weight to the congruence of the judgment of the trial judge and the jury, who saw the witnesses and heard their testimony. *Bound Brook Assn.* v. *Norwalk,* 198 Conn. 660, 667, 504 A.2d 1047, cert. denied, 479 U.S. 819, 107 S. Ct. 81, 93 L. Ed. 2d 36 (1986); *Bleich* v. *Ortiz,* 196 Conn. 498, 500–501, 493 A.2d 236 (1985). "The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion." *Bound Brook Assn.* v. *Norwalk,* supra.

Proximate cause is ordinarily a question of fact. *Coburn* v. *Lenox Homes, Inc.,* 186 Conn. 370, 384, 441 A.2d 620 (1982). Establishment of the causal relationship between a defendant's actions or failure to act and a plaintiff's injuries requires a showing that the action or omission must have been a substantial factor in producing those injuries. *Sanders* v. *Officers Club of Connecticut,* 196 Conn. 341, 349, 493 A.2d 184 (1985); *Mahoney* v. *Beatman,* 110 Conn. 184, 195, 147 A. 762 (1929). " 'The meaning of the term "substantial factor" is so clear as to need no expository definition. . . . Indeed, it is doubtful if the expression is susceptible of definition more understandable than the simple and familiar words it employs.' *Pilon* v. *Alderman,* [112 Conn. 300, 301, 152 A. 157 (1930)]." *Connellan* v. *Coffey,* 122 Conn. 136, 141, 187 A. 901 (1936). In a med-

ical malpractice action, expert testimony is required to establish the standard of professional care to which the defendant is held; *Shelnitz* v. *Greenberg,* 200 Conn. 58, 66, 509 A.2d 1023 (1986); and that the defendant failed to conform to that standard of care. *Pisel* v. *Stamford Hospital,* 180 Conn. 314, 334, 430 A.2d 1 (1980).

The hospital embarks upon a recitation of the facts pertaining to Maric's conduct during the labor and delivery and asserts that it cannot be held liable for the treatment provided by Maric. The jury, however, returned a general verdict for Maric. Thus, we presume that every issue was resolved in his favor. *Stone* v. *Bastarache,* 188 Conn. 201, 204, 449 A.2d 142 (1982). This result is not challenged here. Accordingly, we shall not address the hospital's claim with respect to Maric's conduct. The hospital also suggests, but never actually states, that Victor's condition could have been attributed to an alleged family history of brain problems or to the treatment he received for jaundice, dehydration and malnutrition. The hospital points to no evidence suggesting a causal relationship between the other alleged causes and Victor's condition. On the other hand, our review of the record discloses that there was sufficient evidence from which the jury could reasonably have concluded that the cause of Victor's cerebral palsy was oxygen deprivation immediately following his birth which the jury could have ascribed to a breach of the standard of care to which the hospital was held. Further, we find that there was expert evidence attesting to that standard of care.

Thompson, a registered nurse, licensed by the state of Connecticut, had, at the time of Victor's birth, been employed by the hospital for six years as a staff nurse assigned to labor and delivery, maternity and nursery, and had participated in hundreds of deliveries. She recounted the course of Mohana Mather's labor and

Victor's delivery and described her conduct during the resuscitation efforts. She testified that she had been absent from work for nine weeks and had returned only a few weeks before Victor was born. She stated that she was familiar with the equipment but inexplicably could not see how to remove the mask from the Ambu bag when she needed to do so to attach it to the endotracheal tube. She considered this to be a failure on her part. She further testified that there was no time to stop and figure out how to detach the mask. On cross-examination by Maric's counsel, Thompson stated she did not recall participating in any deliveries using the Ambu bag between her return to work and Victor's birth. She also said it was the responsibility of the nurses to assure that all necessary supplies were available in the delivery room and to restock missing supplies. She asserted that she had checked the equipment in the delivery room where Victor was delivered, ascertained that there was an Ambu bag available and that it was not necessary to restock the supply of endotracheal and suction tubes.

Maric was an obstetrician and gynecologist, licensed in Connecticut and certified by the American Board of Obstetrics and Gynecology. He was not employed by the hospital; he was a staff physician entitled to admit his patients there. He, too, described the events of Victor's delivery, loss of respiration and resuscitation. He testified that he intubated the baby in order to administer oxygen and that it was also necessary to suction fluid from his lungs. He asserted that Thompson's and the hospital's failure to furnish him appropriate suction and endotracheal tubes necessitated his having to remove each tube to use the other one rather than inserting the suction tube inside the endotracheal tube to reduce the number of steps required to oxygenate and suction Victor. Maric testified further that he could not detach the mask from the Ambu

bag and gave it to Thompson to do. The failure to detach the mask prevented the bag from being attached to the endotracheal tube to create a closed system for delivery of oxygen to the infant's lungs as quickly and safely as possible. Maric went on to say that oxygen was not reaching the child's lungs as a result of having to use the Ambu bag with the mask still attached. He corroborated Thompson's testimony that it was the function of the hospital and its personnel to provide proper working equipment, namely, the Ambu bag, and stated further that he was not furnished appropriately sized tubes for suction and oxygenation and that as a result of the failure of the parts to fit together, time was lost in resuscitating Victor who suffered severe oxygen deprivation. His written summary of labor characterized the intubation and extubation as a "quite frustrating experience" and noted, "[s]till we have a problem with the equipment, knowing how to use it and which parts go together." He testified that these notes referred to the problems he encountered with the Ambu bag and the endotracheal and suction tubes.

Ronald Caplan, a clinical associate professor of obstetrics and gynecology with New York Hospital in New York City, appeared as an expert witness for the plaintiff. He was licensed as an obstetrician and gynecologist in New York and Texas and was board certified. He had edited textbooks, contributed chapters to textbooks and authored articles in his field. He estimated that he had delivered three to four thousand babies during his career. He testified that it was his opinion, within a reasonable degree of medical certainty, that Thompson's inability to remove the mask from the Ambu bag was a breach of the standard of care required of her and that it was the duty of the hospital to provide proper resuscitation equipment and its failure to do so was a breach of the standard of care required of it. In answer to a hypothetical question as to the effect

of the failure to connect the Ambu bag to the endo-tracheal tube and the fact that the suction tubes would not fit in the endotracheal tubes during the resuscitation procedure, he responded that there would result a time delay that would have a "totally devastating" effect on the baby. He said that, rather than delivering oxygen to the infant, the oxygen supply was in fact cut off as evidenced by the fact that Victor, instead of getting more pink, became blue and then darker from cyanosis. Caplan also stated that during the period of intubation and extubation the baby was being asphyxiated and brain damaged. He concluded, on the basis of a reasonable degree of medical probability, that Victor's condition following his birth and his condition at the time of trial were "certainly related" to the lapses of the hospital and its agents, servants and employees.

On cross-examination by Maric's counsel, Caplan admitted he was not personally familiar with Griffin Hospital, but stated that there is a minimum standard of care to which all hospitals must adhere. It is clear from the record that the standard to which he referred was that applicable in the United States in February, 1983, to which neither defendant objected. Caplan conceded, however, that whether there is a connection between the events of Mohana Mather's labor and Victor's delivery and his present condition was a matter within the area of pediatric neurology, an area outside his expertise.

Nallainathan, who was board certified in pediatric neurology and neurophysiology, had been seeing Victor about twice a year since he was one year old. He testified that Victor had an atrophied brain and seizure disorder most likely caused by a hypoxic ischemic episode around birth, and that most likely his choreoathetoid cerebral palsy was related to the hypoxic ischemic episode. He described a hyposic ischemic episode as a lack

of oxygen having two components: (1) lack of oxygen which interferes with brain function; and (2) effect on blood pressure or blood supply.

Germano, Victor's pediatrician, testified that he had diagnosed Victor as having choreoathetoid cerebral palsy and developmental delay secondary to neonatal asphyxia. He defined choreoathetoid cerebral palsy as nonprogressive brain damage which, in Victor's case, is manifested in involuntary movements of the upper extremities, tongue, neck, head and fingers. He explained that "secondary to neonatal asphyxia" means "due to lack of oxygen . . . [in] the neonatal period," and that the neonatal period to which he referred was some time between birth and the first time he saw Victor, at approximately twenty to twenty-five minutes after birth.

Ment, who saw Victor approximately three times following his discharge from Yale-New Haven Hospital, characterized his muscle disorders as compatible with birth asphyxia.

Two of the hospital's nurses who were on staff at the time in question were produced as witnesses for the hospital to demonstrate that the appropriate equipment was available in the delivery room when Victor was born. Their testimony was ambiguous at best, the witnesses conceding on cross-examination that they did not know exactly what supplies were in the room at the time in question.

The only medical expert produced by the defendants testified on behalf of Maric. Samuel Smith, an obstetrician and gynecologist, corroborated the testimony of Caplan, Maric and Thompson that it was the function of the hospital to supply delivery room equipment and the responsibility of the nurses to make sure the delivery room equipment was stocked and available.

The hospital argues that cross-examination of Caplan established that he was not competent to testify as to the causal link between Victor's injury and the breach of the standard of care. We observe, however, that the combined testimony of Nallainathan, Ment and Germano was more than sufficient to compensate for any deficiency in Caplan's testimony. Accordingly, we conclude that, taken as a whole, this evidence supports the jury's verdict of liability. The jury could reasonably have found that Victor's condition was the result of the asphyxia suffered within minutes of birth, and that treatment of the asphyxia, which lasted approximately ten minutes, was hampered by the delivery room nurse's inability to manipulate the Ambu bag and her failure to provide Maric with the appropriate endotracheal and suction tubes. Whether the resuscitation equipment was unavailable to Maric because the delivery room was not stocked or because Thompson, a hospital employee, turned in a less than competent performance, the liability still belongs to the hospital. The jury could have found that the hospital breached the standard of care required of it in failing to provide proper equipment. Furthermore, any negligence the jury ascribed to Thompson would have been attributable to the hospital under the doctrine of respondeat superior. *Bria* v. *St. Joseph's Hospital,* 153 Conn. 626, 630, 220 A.2d 29 (1966).

The hospital also argues, for the first time on appeal, that it is not responsible for the acts of the delivery room nurse while she was working under Maric's supervision. The hospital assigns as error the trial court's failure to instruct the jury as to the application of the borrowed servant rule, which provides that the person to whom the services of another's employee are loaned is responsible for the employee's negligence so long as the temporary master actually exercises supervision and control over the servant. Id. The hospital also

claims that the court refused to correct the jury charge to instruct on this rule.

Our rules of practice require that when error is claimed in the court's charge to the jury or refusal to instruct the jury as requested, the brief or appendix must contain a verbatim statement of the charge, all relevant exceptions to the charge and copies of the written request to charge, as appropriate. Practice Book § 4065 (d) (1) and (2). In its appendix, the hospital has reproduced the entire charge to the jury. The record, however, does not reflect that the hospital requested a charge on the borrowed servant rule or excepted to the court's charge on the doctrine of respondeat superior. Furthermore, this record does not contain any evidence whatsoever supporting application of the borrowed servant rule. *Bria* v. *St. Joseph's Hospital,* supra. The trial court had no reason to charge upon an issue not in the case.

Accordingly, we conclude that there was evidence sufficient to support the jury's verdict of liability as to the hospital.

### DAMAGES

The hospital argues that the verdict was excessive as a matter of law, was not supported by the evidence, was based on speculative projections by the plaintiffs' economic expert and was improperly influenced by sympathy and emotionalism allegedly generated by a videotape of one of Victor's therapy sessions. The plaintiffs contend that, with the exception of the hospital's challenge to the sufficiency of the evidence to support the verdict, these issues were not preserved at trial. We disagree.

In its motion to set aside the verdict, the hospital asserted that the verdict was excessive and not supported by the evidence. Although the hospital's argu-

ment on these issues was not well articulated, we deem the issues to have been distinctly raised at trial within the meaning of our rules of practice. Practice Book § 4185. The hospital also contends that the methodology used by the economist was insufficient as a matter of law to support his projections of loss of compensation and cost of lifetime home health care, and that his calculations resulted in excessive amounts. This challenge, as it is addressed to both the sufficiency of the evidence to support the verdict and the size of the verdict, falls within the compass of the motion to set it aside. Further, the hospital preserved its objection to the videotape by taking an exception to its admission after it had been viewed by the court and counsel outside the presence of the jury. The hospital thus complied with the requirements of Practice Book § 4185. Accordingly, the hospital's claims are reviewable.

Litigants have a constitutional right to have factual issues resolved by the jury. *Seals* v. *Hickey,* 186 Conn. 337, 350, 441 A.2d 604 (1982). This right embraces the determination of damages when there is room for a reasonable difference of opinion among fair-minded persons as to the amount that should be awarded. Id., 351. This right is "one obviously immovable limitation on the legal discretion of the court to set aside a verdict, since the constitutional right of trial by jury includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fair-minded men passed upon by the jury and not by the court." *Camp* v. *Booth,* 160 Conn. 10, 13, 273 A.2d 714 (1970); *Seals* v. *Hickey,* supra, 352; *Zarrelli* v. *Barnum Festival Society, Inc.,* 6 Conn. App. 322, 326, 505 A.2d 25, cert. denied, 200 Conn. 801, 509 A.2d 516 (1986). The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury. *Herb* v. *Kerr,* 190 Conn. 136, 139, 459 A.2d 521 (1983); *Pisel* v. *Stamford Hospital,* 180 Conn. 314,

342, 430 A.2d 1 (1980). The size of the verdict alone does not determine whether it is excessive. "The only practical test to apply to this verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption." *McKirdy* v. *Cascio,* 142 Conn. 80, 86, 111 A.2d 555 (1955); *Herb* v. *Kerr,* supra; *Kiniry* v. *Danbury Hospital,* 183 Conn. 448, 461, 439 A.2d 408 (1981); *Katsetos* v. *Nolan,* 170 Conn. 637, 656, 368 A.2d 172 (1976). In considering a motion to set aside the verdict, the court must determine whether the evidence, viewed in the light most favorable to the prevailing party, reasonably supports the jury's verdict. *Campbell* v. *Gould,* 194 Conn. 35, 41, 478 A.2d 596 (1984). The trial court's refusal to set aside the verdict is entitled to great weight and every reasonable presumption should be indulged in favor of its correctness. *Herb* v. *Kerr,* supra; *Katsetos* v. *Nolan,* supra. This is so because "[f]rom the vantage point of the trial bench, a presiding judge can sense the atmosphere of a trial and can apprehend far better than we can, on the printed record, what factors, if any, could have improperly influenced the jury." *Birgel* v. *Heintz,* 163 Conn. 23, 26, 301 A.2d 249 (1972); *Zarrelli* v. *Barnum Festival Society, Inc.,* supra, 327. It is the function of this court to determine whether the trial court abused its discretion in denying the hospital's motion to set aside the verdict. *Katsetos* v. *Nolan,* supra.

There was ample evidence from which the jury could reasonably have concluded that Victor's condition was permanent, that he would require constant care for the rest of his life, that he would never be able to pursue an occupation, that he would need speech, physical and occupational therapy for the rest of his life, and that he could expect to live a normal life span.

Germano testified that Victor will never be able to walk, ambulate or propel himself unassisted; that he will never have voluntary bladder or bowel control and will never be able to care for himself. Nallainathan testified that Victor's motor disability is so severe that he might not walk, and that if he does ambulate, he would need special devices. He added that Victor would need adaptive devices for his upper limbs, braces for his lower limbs and probably some communication aids. He stated further that Victor's language would improve, but at no point would it approach a normal level, nor would his cognitive skills be normal and that his fine motor skills would be the most affected because of his increased muscle tone and involuntary movements. He opined that Victor would need physical, speech and occupational therapy at least through elementary school and possibly throughout his schooling. He also testified that Victor could be expected to live a reasonably normal life span barring untoward problems arising from seizures or infection. He said that while children with cerebral palsy are 30 to 40 percent more likely to suffer seizures, they are no more prone to infection than others. The plaintiffs submitted a life expectancy table prepared by the United States department of health and human services to show that the average life expectancy of a three year old male was 68.1 years.

Marie Solomon, Cynthia Baughn and Amy Hirschel, respectively, Victor's physical, speech and occupational therapists in the Easter Seals program in which Victor was enrolled, testified to his course of therapy, his progress since therapy began and his prospects for improvement. Solomon said that she works with Victor on his gross motor activities, basic mobility and locomotion; that, at the time he began therapy he had little control of his head, could not sit up or roll over; that after two and one-half years of therapy, he can turn over, although his pattern of doing so is abnormal, he

can move around the floor a bit and get himself into a kind of sitting position on his heels but he cannot sit on his own for long; he has trouble grasping and controlling the direction of his arm or of his body and legs when he is trying to move; he cannot use his hands for support and has no developed balance responses; and while his sitting skills have improved, he needs positioning ability for support and safety. She stated further that Victor is not the type of child she would feel comfortable leaving on a couch on his own. She said, on the basis of her experience as a therapist, that she did not think Victor would improve on his own and that he has high potential for getting worse without therapy. When Victor was three years and three months old, she administered a test to evaluate his gross motor skills; his score placed him at the level of a child of four months.

Baughn testified that Victor has not spoken any comprehensible words but makes sounds and can communicate his choice of food or a toy by reaching for it. He does not imitate vocally or use gestures or words. He is aware of his environment, responds to stimuli and can follow some commands. When Victor was three years and three months old, Baughn administered a test, the results of which are keyed to the handicapped population; that is, Victor's scores were compared to those received by other physically handicapped children. He scored at the ten to twelve month level for expressive language and at the fourteen to seventeen month level for understanding.

Hirschel explained that she works on fine motor skills, or use of hands, eventually teaching children to do things for themselves. She said that she has been treating Victor since he was nine months old and that he has made some small progress in the use of his hands: he can bring them together and reach for objects,

but he uses an abnormal pattern of grasping and cannot put things where he wants to because of his inability to release them. When Victor was three years and three months of age, Hirschel tested Victor's fine motor skills and hand use. His score was equivalent to that of a three month old child. She said that while he has made progress in the two and one-half years she has been seeing him, his progress has been very slow and in small increments.

Judy Torello, a special education teacher in the Connecticut department of mental retardation's Early Intervention Program in which Victor was enrolled, testified that in the year and one-quarter since he entered the program he has enjoyed some progress: he was able to crawl, although he did so with his head down; he was able to keep more food and liquids in his mouth; he was able to pull himself up into a standing position; the texture of his food had been increased; he was vocalizing; and he was starting to display dressing skills. At the request of counsel for Maric, she read into the record her summary of Victor's skills at age three. In all categories, he was rated considerably below normal, possessing skills at no level higher than that of a twenty-four month old child.

The jury also had before it reports of two additional physicians. Robert G. LaCamera, medical director of children's services at the Easter Seals Goodwill Industries Rehabilitation Center, had examined Victor at eighteen months of age. In his report, he stated that it was his impression that Victor would walk some day although not necessarily well. Robert B. Sirkin of Newington Children's Hospital, who examined Victor at age three years and one month, noted that Victor can pull himself up to stand and can ambulate with pelvic support, but he is unable to use his upper extremities and has poor head and trunk control, poor coordination and considerable imbalance.

Victor's parents testified to his care at home. Mohana Mather described the difficulty she has in carrying, bathing and feeding Victor. She explained that his body is very stiff and he is very strong, making it problematic to dress and undress him; that it is not possible to pick him up and hold him like other children because of the risk of damage to his shoulders; that feeding him requires that his food be mashed and that she hold his head up so the food will not fall out of his mouth; that he cannot drink from a cup, but drinks from a bottle; that because of the risk of seizures, he sleeps in a crib in his parents' bedroom; that both parents are needed to give him a bath because he cannot stand or sit unassisted; and that she is always worried that he will fall because of his lack of balance. She said that she is having problems carrying him, that her back aches all the time and that she cannot handle him on her own anymore. Victor's father corroborated his wife's testimony. In addition, he explained that Victor uses a special wheelchair with a detachable seat, and he described the process of moving Victor into the car. He said that it takes considerable strength to transfer Victor and the seat to the car and that it is very difficult for his wife to do it. He also testified that it takes one hour to one and one-half hours to feed Victor, and that when he has a bowel movement, it is necessary that he be carried to the toilet and held there until he is finished, about twenty minutes. Both parents asserted that because of the care and attention Victor requires, they cannot leave him with friends or relatives. They also stated that they had no intention of committing Victor to an institution but planned to keep him at home.

The hospital was afforded an opportunity to challenge the testimony through cross-examination and, in fact, all these witnesses, except Hirschel, were cross-examined by counsel for Maric, the hospital or both. The hospital did not object to the admission of the Sirkin and

LaCamera reports. It was for the jury to evaluate the credibility of the witnesses and the weight to be accorded the evidence. *Salvatore* v. *Milicki,* 163 Conn. 275, 278, 303 A.2d 734 (1972). On the basis of this evidence, the jury could reasonably have found that Victor's condition was permanent and that he would probably never be capable of tending to his most basic needs, and that his parents were experiencing increasing physical difficulty in taking care of him as he grew. The jury could also have concluded from the testimony of the physicians and therapists that Victor would progress, if at all, very slowly, never achieving normal levels of development. Thus, the jury could reasonably have found that Victor would never be able to follow an occupation, that care at home would be needed to assist in his daily routine activities, and that he would require physical, occupational and speech therapy for life.

With respect to the economic basis for the jury award, the plaintiff and the hospital agree that the medical expenses incurred to the time of trial totaled $27,738. The hospital principally disputes the method used by the plaintiffs' economist, Arthur Kenison, professor of business and economics at St. Anselm's College in Manchester, New Hampshire, to arrive at the projections of loss of compensation and costs of home care over Victor's lifetime, and the present value of those damages. Kenison had taught economics and business courses for twenty-one years. He had received his undergraduate education in business and economics at St. Anselm's College. He had earned masters degrees in business administration and economics from Columbia University and the University of New Hampshire, respectively, and his doctorate in economics from Boston University. In addition to teaching, he operated a business evaluating economic losses in personal injury cases. Specifically, the hospital takes issue with the

inflation and discount rates applied, and criticizes Kenison's reliance on municipal bonds in modeling his discount rate. The hospital offers alternate calculations that result in substantially lower present value figures for home health care costs and loss of compensation.

Economic evidence and the testimony of economic experts are appropriately weighed by the jury. See, e.g., *Kiniry* v. *Danbury Hospital,* 183 Conn. 448, 460–61, 439 A.2d 408 (1981); *Pisel* v. *Stamford Hospital,* 180 Conn. 314, 344, 430 A.2d 1 (1980). The jury is under no obligation to credit the evidence proffered by any witnesses, including experts; *Johnson* v. *Healy,* 183 Conn. 514, 516–17, 440 A.2d 765 (1981); *Smith* v. *Smith,* 183 Conn. 121, 123, 438 A.2d 842 (1981); even if that evidence is uncontroverted. *Pisel* v. *Stamford Hospital,* supra. "[T]he acceptance or rejection of an opinion of a qualified expert is a matter for the trier of fact unless the opinion is so unreasonable as to be unacceptable to a rational mind." *National Folding Box Co.* v. *New Haven,* 146 Conn. 578, 586, 153 A.2d 420 (1959).

Kenison's computations of loss of compensation through Victor's anticipated retirement at age sixty-one were founded on a projected annual earnings increase of 7.6 percent, comprised of 6.6 percent inflation and 1 percent real growth. The resulting figures were reduced for federal income tax liability and then discounted to present value using an annual interest rate of 6.6 percent, representing the historic yield on high grade tax-free municipal bonds. He also factored in such considerations as periods of unemployment and loss of work time due to illness or accident. He explained the probable effect of a slowdown of inflation on earnings projections and discount rates. Similar interest rates were used in calculating the cost of home health care over Victor's lifetime.

The hospital urges us to adopt the so-called adjusted discount rate method using an interest rate of 2 percent, which, the hospital alleges, results in a "real rate of interest." The hospital offers no reason for preferring the adjusted discount rate method other than that it has been used by some federal courts, and that it results in a lower damages award. The hospital has directed our attention to no case or other authority in which Kenison's method has been discredited or rejected.

We hasten to note that neither defendant sought to introduce economic evidence to refute Kenison's testimony, nor did they present economic experts of their own to meet Kenison's assertions. Neither defendant moved to strike Kenison's testimony. Further, both defendants extensively cross-examined Kenison as to his method of projection, interest rates assumed, historic and present rates of inflation, his use of work expectancy statistics and the dollar figures at which he arrived through his calculations. Neither defendant objected to Kenison's qualifications to testify. In sum, the hospital contented itself with cross-examination of the plaintiffs' expert although it was not required to do so. See *O'Rourke* v. *Eastern Air Lines, Inc.*, 730 F.2d 842, 858 (2d Cir. 1984) ("[i]f the [defendant] had wanted the lower court to adopt one of the alternate discount rates that it now urges upon us, it should have had its own experts testify on this matter"); *Doca* v. *Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30, 39 (2d Cir. 1980) ("[i]f litigants prefer to offer evidence as to future rates of both inflation and interest, they are entitled to do so"). We shall not entertain the hospital's belated attempt to mount an evidentiary attack in rebuttal of evidence produced below. It had ample opportunity to refute Kenison's testimony. The fact that cross-examination apparently did not suffice to discredit Kenison's testimony in the estimation of the jury

provides no justification for an evidentiary showing the defendant could have made below. It is not this court's function to retry any factual issue in this case. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole,* 189 Conn. 518, 524, 457 A.2d 656 (1983). Further, we recognize that economics is an inexact science and we hesitate to adopt any particular method for computing the present value of lost compensation and future costs. "Predictive techniques are constantly being refined, as are methods of correctly assessing the immediate past." *Doca* v. *Marina Mercante Nicaraguense, S.A.,* supra. With respect to loss of compensation, Kenison calculated amounts for eight categories representing seven different education levels and the average of all categories. There was evidence that, had Victor not been disabled, it is probable he would have gone to college: his father is an engineer and a number of close relatives in both his mother's and father's families have had college or professional educations. Both parents testified that they had wanted Victor to go to college. We cannot say that it would have been unreasonable for the jury to have adopted Kenison's present value figure for lost earning capacity based on college graduates, $1,772,000. Compare *McKirdy* v. *Cascio,* supra.

As to home health care, Jayantha Mather estimated that a home health aide would be needed before and after Victor goes to school, about seven hours each weekday; ten hours each Saturday and Sunday; full time, approximately ten hours a day, during the month school was not in session; and full time following the end of his schooling at age twenty-one. Marilyn Berlinski, administrator of Upjohn Health Care Services, a temporary employment agency specializing in health care personnel, testified to the cost of home health care aides. On the basis of the rates she furnished, which are established by the Connecticut commission on hospitals and health care, and the hours for which such ser-

vices would be needed, as related by Jayantha Mather, Kenison concluded that the present value of the cost to age twenty-one was $699,504 and, from age twenty-one to age seventy, $3,421,190, for a total of $4,120,694.[3]

The total amount for medical expenses to the time of trial, loss of compensation and cost of home health care is $5,892,694, almost two thirds of the entire damages award. The jury also heard testimony from Berlinski as to hourly rates for speech, occupational and physical therapy conducted at home, and testimony from Solomon that these services are performed by Easter Seals at their facilities from infancy through old age. The jury also had before it invoices showing the actual rates charged by Easter Seals for these therapies. They heard testimony as to the cost, type and frequency of replacement of wheelchairs and orthotic and adaptive devices, and testimony as to Victor's need of future medical care. The plaintiffs assert that this evidence supports additional damages amounting to approximately $1,525,000 to $1,625,000. The hospital counters that the evidence supports additional damages of $38,000 to $67,000.

The amount of the award is peculiarly within the province of the jury. *Pisel* v. *Stamford Hospital,* supra,

---

[3] The hospital complains that the trial court instructed the jury that home health care would be necessary at the cost projected by Kenison. The hospital did not object to the charge but claims it was plainly erroneous. The hospital has not cited the exact portion of the charge to which it now objects, as required by Practice Book § 4065 (d) (2), but the pages of the transcript to which it refers form part of the court's summary of the testimony.

The court, in fact, instructed the jury that, in awarding damages, it could take into account the care and treatment it, the jury, found was required by Victor.

The hospital also takes issue with the jury charge as to the cost of lifetime therapy. The hospital does not specify the portion of the charge to which it refers nor does it provide a transcript reference. Consequently, we have no basis for review of this aspect of the charge.

342. The jury had the right to accept whatever portion of the evidence it chose and consider it in its calculations. Id., 344. The jury was also entitled to assess Victor's permanent injury and its effect on his capacity to pursue life's enjoyments, and it had the right to evaluate the pain and suffering that it concluded had resulted from Victor's injury.[4] Id. In light of the considerable evidence as to the scope, duration and severity of Victor's injury, we conclude that the jury could reasonably have arrived at its verdict. "While the amount of the verdict is substantial, in a relative sense it is no more substantial than the named plaintiff's injury." Id.

At this juncture, we may appropriately address the hospital's argument that the standard for measuring damages was conceptually incorrect. The hospital contends that Victor should be compensated for lifetime maintenance costs only, and that any amount in excess of such maintenance costs constitutes an award to Victor's family. The hospital did not raise this issue at trial. The hospital acknowledges that Victor's parents sought no damages on their own behalf, except for medical expenses incurred to the time of trial. It asserts, however, that an award for such items of damages as loss of life's enjoyment confers a recovery on the family. We find this claim to be specious, at best. There is no basis in the record for the hospital's argument that a windfall has been conferred on Victor's family; in fact, in its charge, the trial court cautioned the jury that its

---

[4] The hospital argues that awards for future pain and suffering and other nonpecuniary losses should be reduced to present value. Once again, the hospital is advancing a claim not made at trial. In addition, it points out that the trial court instructed the jury that in awarding damages, it should keep in mind that it was making a present payment for sums due in the future. Furthermore, we are aware of no authority which mandates that damages for future pain and suffering be discounted for present value. This argument is not properly before this court nor does it merit plain error review.

award, if any, to Victor's father was limited to medical and other expenses incurred to date.

We have long held that the loss of life's enjoyments is compensable in personal injury and wrongful death cases. See, e.g., *Kiniry* v. *Danbury Hospital*, supra, 460; *Pisel* v. *Stamford Hospital*, supra; *Katsetos* v. *Nolan*, supra, 657. The hospital proffers no rationale for abolishing awards for damages beyond maintenance costs. This claim is without merit.

Finally, we address the hospital's argument that it was error for the court to have allowed the jury to view a videotape[5] of one of Victor's therapy sessions, filmed about seven months before trial. The forty-four minute long tape was offered for use in conjunction with the testimony of the therapists as an aid in explaining to the jury what occurred during therapy sessions. The hospital claims that the videotape was cumulative to the testimony of the therapists, two of whom had testified that its use would make it easier to explain Victor's therapy sessions to the jury than would a verbal description. The hospital also characterizes the tape as "immensely emotion-laden and sympathy arousing" because Victor, whom the hospital describes as a "tiny infant," allegedly constantly looked at the camera. This, the hospital, asserts, was due to the presence of his mother allegedly standing behind the camera. The hospital continues that Victor's gazing at the camera caused "unnecessary verbalization toward Mather" and that, together with the "lulling music" in the audio portion of the tape, a highly personalized, emotional and prejudicial effect was achieved. The hospital's arguments are completely without merit.

Videotapes, properly authenticated and relevant to the issues, are admissible in evidence at the discretion

---

[5] The videotape, which was viewed by the jury, was never formally admitted into evidence, either for identification or as a full exhibit. This was apparently due to an oversight. This court ordered that it be marked as a court exhibit for identification.

of the court. *Pisel* v. *Stamford Hospital,* supra, 323. The rule for admitting such evidence is well established: if it has a tendency to prejudice the jury, the court must determine whether its probative value outweighs its prejudicial effect. Id., 323–24.

We have viewed the videotape and agree with the trial court as to its value as material assistance in relating to the jury the type of therapy Victor was receiving for his disabilities. There was no evidence that the therapy session was staged; to the contrary, there was evidence that it depicted a regularly scheduled session, and was representative of the therapy Victor was receiving both at the time of the taping and at the time of trial. There is also not a shred of evidence that Victor's mother was behind the camera. Indeed, the hospital exaggerates both Victor's appearance and his response to the camera's presence. First, at the time of the taping, Victor was approximately three months shy of his third birthday and thus was not a "tiny infant" as that notion is commonly understood. Second, although Victor looked at the camera from time to time, it is not true that he looked at it constantly or even frequently. Finally, the music of which the hospital complains was itself a therapeutic tool and spanned a range of rhythms and moods. Therefore, we conclude that it was not error for the trial court to have permitted the jury to view the videotape.

We conclude, therefore, that the award falls "somewhere within the necessarily uncertain limits of just damages [and does not so shock this court's] sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption."[6] *McKirdy* v. *Cascio,* supra; *Herb* v. *Kerr,* supra; *Katsetos* v. *Nolan,* supra.

---

[6] The hospital argues that the damages awarded in this case were inherently speculative and that the trial court was itself so overcome with emo-

There is no error.

In this opinion the other justices concurred.

tion and bias that it was unable to exert a "steadying and level-headed influence" over the proceedings. We have painstakingly scoured the record and have found no basis whatsoever for such allegations, which should not lightly be advanced by counsel. The hospital also argues that Connecticut public policy, as expressed by the legislature in the Tort Reform Act, Public Acts 1986, No. 86-338, militates against large damage awards. As the hospital concedes, the Tort Reform Act has no effect on this case. Our review of the verdict is governed by the principles articulated in the body of our opinion. Accordingly, we do not address this contention.