[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiffs, Holly Blinkoff, Quality Sand and Gravel, d/b/a B B Group, Norman Ruot and Carol Ruot have appealed a decision of the Planning and Zoning Commission of the City of Torrington granting a special exception to 0 G Industries, Inc. to conduct an earth excavation on its property located on the Winsted Road in the City of Torrington. The plaintiffs own property within 100 feet of the application and are therefore aggrieved. Connecticut General Statutes § 8-8(1).
On July 2, 1998, the Defendant 0 G Industries, Inc. filed a Special Exception Application with the Defendant. City of Torrington Planning Zoning Commission, seeking a two (2) year renewal of an existing Special Exception Permit, to continue excavation of earthern material (rock quarry) including drilling CT Page 7812 and blasting, processing (crushing and screening) and hauling off site. (R#2). 0 G owns one hundred ninety-one (191) acres at the subject location, sixty (60) of which would support the earth excavating operation. The remaining one hundred thirty-one (131) acres surround and buffer the sixty (60) acres, where the earth excavation occurs. (R#38 at Page 11).
The excavation that 0 G sought to continue had been underway for ten (10) years pursuant to the provisions of a Special Exception permit, which was unanimously awarded to 0 G by the Torrington Zoning Board of Appeals (which then had jurisdiction over Special Exception Applications), on July 18, 1988. (R#15). At that time Special Exception Permits had one (1) year terms. Subsequently, on August 14, 1989, the Zoning Board of Appeals added three (3) conditions to the permit and unanimously renewed the permit for one year. (R#16). On August 13, 1990, the Zoning board of Appeals added an additional four (4) conditions and unanimously granted a one (1) year renewal of the permit (R#17). On August 12, 1991, the Zoning Board of Appeals added two (2) additional conditions and issued a further one (1) year renewal of the underlying permit. (R#18). On August 12, 1992, the Planning Zoning Commission added several additional conditions and issued a two (2) year renewal of the existing permit. (R# 19). In early 1992 a comprehensive effort was undertaken by the City of Torrington Staff and the Planning Zoning Commission to revamp the Zoning Regulations. As a result, the City determined that there would be a two (2) year renewal period, rather than a one (1) year renewal period for Special Exception Permits pertaining to Earth Excavation, and that the jurisdiction of Special Exception Permits would vest in the Planning Zoning Commission, rather than in the Zoning Board of Appeals. (R#37) at.
On July 28, 1994, the Torrington Planning Zoning Commission added additional conditions and approved a two (2) year renewal of the existing permit. (R#20). Subsequently on September 11, 1996, the Torrington Planning Zoning Commission added additional conditions and authorized an additional two (2) years extension of the underlying Special Exception Permit. (R#21).
Over the course of the seven (7) approvals from 1988 through 1996, and the ten (10) years of quarry operations, the Torrington Zoning Board of Appeals and subsequently the Torrington Planning Zoning Commission placed conditions upon the renewal of the Special Exception Permit, in order to make certain that 0 G's CT Page 7813 operation complied with the Torrington Zoning Regulations. At the time of the issuance of the 1996 permit renewal, fifteen (15) conditions were in place and were part of the Special Exception. (R#21).
O G filed is Special Exception Application on July 2, 1998.Record Item 2. Torrington duly noticed and held a public hearing on the application on August 26, 1998. Record Items 4. 5 6. The public hearing was opened and concluded on that date. Torrington, at its September 23, 1998 meeting, voted to grant 0 G's Special Exception Applications for a two year period, Record Item 30. with numerous conditions. 0 G's July 2, 1998 application was a renewal of is special exception which was first granted in July of 1988. Record Items 15-21.
Blinkoff filed her appeal of Torrington's decision on October 9, 1998. In that appeal Blinkoff alleged nine reasons why Torrington's decision was illegal, arbitrary and in abuse of its discretion. They are:
 a. Approval of the special exceptions violated the Town's regulations;
 b. The Commission failed to assess the traffic implications and/or ask for a traffic report;
 c. The Commission failed to assess the environmental conditions;
 d. The Commission failed to receive a report from the Torrington Area Health Department (TAHD) regarding noise;
e. The Commission failed to receive a noise permit from TAHD;
 f. 0 G Industries had not complied with previous Commission conditions;
g. The Commission did not apply its own regulations;
 h. The Commission allowed staff reports to be filed after the public hearing was closed;
i. For such other good cause as the record indicates.
In her brief and supplemental brief, Blinkoff has raised four CT Page 7814 (4) issues. They are: that Commissioner Turn had a personal and financial interest in 0 G's application; the Commission based its decision on a staff report received after the close of the public hearing; the Commission did not follow its past practice of denying the application because of vocal public opposition; and the quarry road exceeds the grade limitations for a driveway under Torrington's zoning regulations.
The issues that were raised by Blinkoff and not briefed are considered abandoned. Maher v. Griffin Hospital,207 Conn. 125 (1988); Hartford National Bank Trust Co. v.Tucker, 178 Conn. 472 1979 cert. denied 445 U.S. 904
(1980). Blinkoff has also raised several issues for the first time in her brief. These issues are not to be considered by the Court.
 I.
Blinkoff has. for the first time in her brief, raised the issue that Mr. Turri, a member of Torrington, had a financial and personal conflict of interest when he acted upon 0 G's application. §§ 8-11 and 8-21 of the General Statutes deal with conflicts of interest and planning and zoning commissions. They state in pertinent parts:
. . . § 8-11: No member of any zoning commission or board and no member of any zoning board of appeals shall participate in the Hearing or decision of the board or commission of which he is a member upon any matter in which he is directly or indirectly interested in a personal or financial sense . . .
 . . . § 8-21: No member of any planning commission shall participate in the hearing or decision of the commission of which he is a member upon any matter in which he is directly or indirectly interested in a personal or financial sense.
Mr. Turri is the Vice-Chairman of Torrington. Turn is the president of Turn, Inc., an electrical contractor in the City of Torrington. Blinkoff is alleging that Mr. Turri had a financial and/or personal interest in 0 G's application for a special exception. In support of her allegation, Blinkoff has attached to her brief and supplemental briefs, copies of documents relating to electrical work done by Turn on three projects — Vogel-Wetmore Elementary School; Charlotte Hungerford Hospital; and 0 G CT Page 7815 Industries Office Building. Blinkoff is alleging that Turri contracted with 0 G for those projects and as such had a financial and/or personal interest in 0 G's application for a completely unrelated project which had been in operation for at least ten (10) years. Blinkoff is basically alleging that by virtue of those projects Turn was financially indebted to 0 G. Blinkoff is making this naked assertion without any knowledge of the facts.
The Vogel-Wetmore School was a project of the City of Torrington. Turn was awarded the contract for the electrical work by sealed competitive bids by the City of Torrington, not 0 G. The contract between Torrington and Turn is attached hereto as Exhibit A. 0 G was contracted by the City of Torrington to act as the Construction Manager for the project and had a separate contract with Torrington for the school project. The Charlotte Hungerford Hospital project was also the subject of competitive bidding. Tunis, as the low bidder, was awarded the contract. 0 
G was the construction manager on the project. Turn was again the low bidder on the 0 G office building expansion. Turn was not given the job as a pay off for voting favorably on 0 G's application. All three jobs were the result of Turn being the low bidder in a competitive bidding process.
The determination of what constitutes a conflict of interest is a factual determination. The test to determine if a conflict exists is not whether the private interest of a commission member in fact conflicts with his public duty, but whether it might do so. Josephson v. Planning Board, 151 Conn. 489 (1964). It is the appearance of a conflict that must be given consideration.
The earliest conflict case dealt with a case where a husband sat as a board member hearing his wife's application. The Court correctly held his participation improper. Low v. Madison,135 Conn. 1 (1948). A corollary to the general rule soon developed, to the effect that local government would be seriously handicapped if any conceivable interest, no matter how remote or speculative, would require disqualification. Anderson v. Norwalk ZoningCommission, 157 Conn. 285 (1968).
Some cases where no conflict was found include: Zeigler v.Thomaston, 43 Conn. Sup. 373 affirmed 232 Conn. 270 (1995) where the ZBA received a letter into evidence from the husband of a disqualified board member; Westporters Who Love Como v. Planningand Zoning Commission, 1995 Westlaw 55120 (J.D. of CT Page 7816 Stamford-Norwalk and Stamford) where the Commission approved a special permit to expand a marina where a commission member was on the waiting list for a boat slip at the marina; Furtney v.Zoning Commission, 159 Conn. 585 (1970) where a commission member was a bank official where the application did his banking;LaTorre v. City of Hartford, 167 Conn. 1 (1974) where a City councilman was a member of a law firm who represented a party who benefitted [benefited] from a street widening decision;Dana-Robins Conn. v. Common Council, 166 Conn. 207
(1974) where a commission member acted on an application for an apartment complex located .7 of a mile from a college where the member of his mother and sister owned stock in a company which provided housing for college students.
Turri did not have any interest in the subject of 0 G's application, which was the renewal of its special exception to operate an earth excavation operation.
Blinkoff has failed to show that Turri had any actual or perceived conflict of interest, either personal or financial, in 0 G's application and her appeal on that issue should be rejected.
 II.
Blinkoff is claiming that Torrington erred in accepting a staff report after the close of the public hearing. The staff report prepared by the City Planner was given to Torrington after the close of the public hearing. Record Item 25.
Blinkoffs claim is unsupported by case law. It is clear that Torrington was entitled to rely on technical and professional assistance by its staff. Gardner v. Conservation Commission ofWaterford, 222 (CONN. 98 (1992); Hawkes v. Planning and ZoningCommission of Farminton, 156 Conn. 207 (1968). Those staff reports can be submitted after the close of the public hearing. A Commission cannot receive additional evidence submitted by an interested party after the close of a public hearing but can receive and consider staff reports. Pizzola v. Planning andZoning Commission of Plainville, 167 Conn. 202 (1974). Spero v.Z.B.A. of Guilford, 217 Conn. 435.
Blinkoff argues that Torrington's Zoning Regulations allows for applicants to comment on staff reports and cites § 8.4.2.F of the Regulations. § 8.4.2.F states: "All comments CT Page 7817 from the staff shall be forwarded to the applicant at least two days prior to the Commission meeting. This is to allow the applicant time to respond to the staffs comments and make the necessary changes so that the project can be acted upon in an expeditious manner."
That section deals with site plans only. No public hearing is held on site plan applications. Where a public hearing is held, the Commission cannot receive exparte communications from a party to the application after the public hearing is done. Pizzola,supra. Blinkoffs claim that the staff report received after the close of the public hearing was improper is erroneous and cannot be the basis to sustain her appeal.
 III.
Blinkoff next claims that Torrington failed to follow its own past interpretations of its own Zoning Regulations when it did not deny 0 G's application because of "vocal public opposition." Blinkoff is apparently claiming that when there is vocal public opposition to an application, Torrington should deny it. Blinkoff is basing her claim on the fact that Torrington had previously denied an application to expand an operation filed by a company owned by her in which there was public opposition. Without any evidence to back her claim, Blinkoff is claiming that was the motivating reason in Torrington denying her previous application. Blinkoff fails to note that Torrington :n denying her previous application stated on the record the reasons for the denial or that Torrington had previously approved applications for the permits for her existing operation as it did with 0 G in this case.
Torrington cannot and does not decide applications based upon public opinion. Each application is considered on its own merits after hearing evidence both for and against an application. If an application meets the zoning requirements, it is approved and vice versa. Vocal public support or opposition is not can cannot be a factor in its decisions. This claim by Blinkoff is without any basis in law or fact and should be dismissed.
 IV.
Blinkoffs final argument, raised for the first time in her supplemental brief, is that the paved road leading into the quarry site exceeds the grade limitations allowed for driveways CT Page 7818 under Torrington's Zoning Regulations, and as such Torrington should not have approved 0 G's application.
Blinkoff claims that the access road to the quarry site is a driveway as defined by Torrington's Zoning Regulations and since its grade exceeds twelve percent (12%) it is in violation of the Regulations, Blinkoff has presented no evidence that the access road is a driveway.
§ 2 of the Zoning Regulations is the definition section. Driveway is defined as "an accessway which has no parking along it and either connects a street with a parking area or connects two distinct parking areas." Blinkoff argues that § 5.12.2G(b) applies to the access road. § 5.12 deals with parking. § 5.12.2G(b) states: "The maximum grade for all driveways and aisles shall not exceed 12%" "Aisle" is defined in § 2 as "an accessway through a parking area which has direct assess to one or more parking spaces." Blinkoff correctly points out that "parking area" is not defined in the zoning regulations. However, both driveways and aisles which are limited to the 12% grade are defined as "accessways." "Accessway" is defined in the zoning regulations as "a strip of land fronting on a City accepted street that serves as the means of obtaining access to the useable portion of a flag lot. The accessway is part of the lot it serves." It is clear from the above definitions that the access road which services the quarry is not a driveway under Torrington's Zoning Regulations.
Additionally, Blinkoffs own previous argument does not support this claim. 0 G was first granted a special exception in 1988 with the same access road and has since received several renewals. Blinkoff's previous argument that zoning ordinances must be applied in the same manner to persons with similar circumstances and where an agency has in the past interpreted an ordinance in one way, that construction must be given some weight in applying it in the future would apply here. PlaintiffsSupplemental Brief at P. 12.
 CONCLUSION
For all of the foregoing reasons, the plaintiffs appeal is dismissed.
Honorable Walter M. Pickett, Jr., Judge Trial Referee CT Page 7819